UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  v.<br><br>PETER R. TURNER, LATANYA ANDREWS, and THELMA LEONARD,<br><br>  Defendants. | Crim. Action No. 06-0026 (CKK) |

**MEMORANDUM OPINION**
(July 12, 2006)

Currently before the Court is Defendant Thelma Leonard's Motion to Suppress Statements and Memorandum of Points and Authorities in Support Thereof, which seeks suppression of her statements made to law enforcement officers in an October 2004 telephone interview <u>and</u> her testimony before the grand jury on July 26, 2005.[1] Upon a searching examination of Defendant Leonard's motion, the Government's Opposition, the relevant case law, and the entire record herein, the Court shall deny Defendant Leonard's Motion to Suppress Statements.

**I: BACKGROUND**

On January 31, 2006, Peter R. Turner, LaTanya Andrews, and Thelma Leonard were indicted in this district in a three-count indictment charging each of them with conspiracy to fraudulently obtain money from the Federal Employees Group Life Insurance ("FEGLI") program, a group term life insurance program established by the government, in violation of 18 U.S.C. § 371

---

[1] Defendant Leonard's motion "respectfully moves this Court to suppress as evidence against her any and all statements allegedly made to prosecutors and/or law enforcement officers, and to the grand jury on or about July 26, 2005." Def. Leonard's Mot. to Suppress at 1. However, Defendant Leonard's legal argument focuses almost entirely on her July 26, 2005 grand jury testimony. *See generally id.* The Court denies Defendant Leonard's motion as it relates to "all statements allegedly made to prosecutors and/or law enforcement officers" given her failure to legally support such a contention and for the same reasons that doom her argument as it relates to her grand jury testimony.

("Conspiracy to Commit Offense or to Defraud United States"), and Andrews and Turner each were also charged with one count of bribery in violation of 18 U.S.C. § 201(b) ("Bribery of Public Officials and Witnesses"). Andrews was a payroll technician for the Department of Veterans Affairs Medical Center (hereinafter, "DVAMC"), Turner was a volunteer driver for the DVAMC, and Leonard was an associate of Turner. *See* Indictment ¶¶ 1-3. The Indictment was unsealed on February 8, 2006.

The Indictment alleges that Turner, Andrews, and Leonard conspired between December 8, 2000 through on or about January 10, 2006, *id*. ¶ 7, to file a forged FEGLI form falsely designating Turner as a one-half life-insurance beneficiary for Vester Mayo, a fellow employee of the DVAMC and his former girlfriend, *id*. ¶ 5, in Mayo's official personnel folder, *id*. ¶¶ 9-10. Andrews allegedly used her position as an employee of the DVAMC to cause the forged FEGLI form to be included in Mayo's official DVAMC personnel folder. *Id*. ¶ 12. Leonard allegedly assisted the conspiracy by signing the forged beneficiary form as a signature witness knowing that it had not been signed by Mayo. *Id*. ¶ 11.

On or about December 8, 2000, while still an active employee of the DVAMC and while insured under the FEGLI program, Mayo suffered a stroke and was hospitalized. *Id*. ¶ 6. Shortly thereafter, Mayo lapsed into a coma and died on or about December 22, 2000. *Id*. Following her death and the alleged completion of the conspirators' plans, Turner then filed a claim with the FEGLI program, obtaining a payment of approximately $20,500. *Id*. ¶ 21. Allegedly in return for their loyalty and assistance in the scheme, Turner paid Andrews $1,000 from the proceeds on or about February 7, 2001, *id*. ¶ 22, and later – on or about July 16, 2002 – paid another $1,000 to Leonard's spouse, who is now deceased, for the Leonards' cooperation, *id*. ¶ 23.

After Vester Mayo's death, her mother questioned the validity of the Designation of Beneficiary form making Turner a 50% beneficiary for the FEGLI life insurance benefits. *See* Def. Leonard's Mot. to Suppress at 2, ¶ 5. An investigation was undertaken by the Department of Veterans Affairs and by the Office of Personnel Management, which concluded that Ms. Mayo's signature and another signature on the form were forged, and that the forged form was fraudulently placed in Ms. Mayo's personnel file. *Id*. On or about October 13, 2004, Ms. Leonard was subpoenaed to appear before a grand jury investigation the allegations of fraud. *Id*. at 3, ¶ 6. On or about October 18, 2004, Leonard was contacted by prosecutors and law enforcement officers over the telephone in lieu of her scheduled grand jury appearance. *Id*. According to the Government, during this conversation, Leonard made statements admitting that the signature on the form under "witness" appeared to be hers; that she recalled signing a form like that years ago in Mayo's presence, believing that she was doing a favor for her husband's friends because they were buying a house and wanted insurance; indicating that she signed the form long before Mayo was actually hospitalized in December 2000; and denying any knowledge of any payment by Turner in exchange for signing the form. *Id*. at 3, ¶ 7. Following that interview, Leonard was advised that she did not have to appear before the grand jury pursuant to the previous subpoena. *Id*.

In or about July 2005, Leonard was again subpoenaed to appear before the grand jury investigating the allegations of FEGLI-related fraud in this case. *Id*. at 3, ¶ 8. According to Defendant Leonard, by this point the Government had already obtained a copy of the $1,000 check paid by Turner to Leonard's husband, which had been deposited into their joint checking account, which heightened the Government's suspicion about a possible conspiracy. *Id*. However, prior to her grand jury testimony, the Government did not give Ms. Leonard the customary "target" warnings when she appeared on July 26, 2005 in response to the subpoena. *Id*. at 4, ¶ 8. Instead,

the prosecutor and agents met briefly with her outside of the grand jury room, and – according to Defendant Leonard – she was specifically advised that she was not a target; that the Government was not interested in her; that they wanted her to cooperate and testify before the grand jury; and that if she told the truth then she would have nothing to worry about. *Id*.

Following the Government's representations, Leonard testified before the grand jury on July 26, 2005, and – according to her representations – provided testimony that "was largely consistent with her statement to the [G]overnment in October 2004." *Id*. at 4, ¶ 9. Eventually, in December 2005, a "target" letter was sent to Leonard, offering her another opportunity to testify before the grand jury. *Id*. at 4 n.1. During the telephone conversation following that letter, Leonard indicated that she was going to contact an attorney; prior to this conversation, Leonard had not retained or been represented by counsel. *Id*. at 4 n.1 & ¶ 10. Apparently, Leonard did not take up the Government's offer and did not return for a second round of grand jury testimony. *Id*. In early January 2006, the grand jury indicted Leonard, as requested by the Government – a decision that was based, at least in part, on her statements to the Government and to the grand jury itself. *Id*. at 4, ¶ 10.

Following Defendants' arraignments in February 2006, this Court held a series of status conferences with Defendants present. Following the April 6, 2006 status conference, the Court set a schedule for various pre-trial filings, including any motions to suppress or motions for severance. Pursuant to the Court's schedule, Defendant Leonard has submitted a motion to suppress the statements that she made to law enforcement agents and her grand jury testimony, to which the Government has filed an Opposition.

## II: DISCUSSION

Defendant Leonard makes two general arguments in support of her Motion to Suppress

Statements. First, Defendant Leonard contends that her statements to law enforcement agents and the grand jury should be suppressed because she had been given informal, "equitable" immunity. *See id.* at 4-5, ¶ 11. Second, Defendant Leonard suggests that her right not to incriminate herself, founded under the Fifth Amendment, was violated by virtue of the evidence in the Government's possession and the coercive nature of a grand jury subpoena. *Id.* at 5-6, ¶ 12. As discussed below, each argument is without merit.

### A.    Informal, "Equitable" Immunity

Defendant Leonard contends that in a discussion immediately prior to her grand jury testimony, she was told that (1) she was not a target; (2) the Government was not interested in her; and (3) if she told the truth, she would have nothing to worry about. *Id.* at 3-4, ¶ 8. Based upon these and surrounding facts, Leonard suggests that she was provided an informal grant of immunity by the Government such that her statements to the grand jury cannot be used against her.

Agreements to exchange cooperation and/or testimony for immunity are governed by traditional principles of contract law. *See United States v. Pollard*, 959 F.2d 1011, 1022 (D.C. Cir. 1992); *United States v. Oruche*, 257 F. Supp. 2d 230, 237-38 (D.D.C. 2003). "While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement." *United States v. McHan*, 101 F.3d 1027, 1034 (4th Cir. 1996) (citing Restatement (Second) of Contracts § 19 (1979)). As in other cases in which questions of contract formation are presented, the court applies an objective standard to the circumstances that allegedly gave rise to an agreement; that is, the claimed subjective belief of the defendant is irrelevant to the analysis. *See United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir. 1995) ("We interpret informal immunity agreements using ordinary contract principles.") (citing *United States v. Plummer*, 941 F.2d 799, 802 (9th Cir. 1991)); *Northland Capital Corp. v.*

*Silver*, 735 F.2d 1421, 1426 n.7 (D.C. Cir. 1984) ("The principle that objective manifestation of intent is controlling in contract formation is very well established."). Under the concept of "equitable immunity," which is similar to the doctrine of specific performance, courts have enforced informal grants of immunity where:

> (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

*McHan*, 101 F.3d at 1034 (citing *Rowe v. Griffin*, 676 F.2d 524, 527-28 (11th Cir. 1982); *United States v. Carter*, 454 F.2d 426, 427-28 (4th Cir. 1972) (en banc)).

In light of the facts and circumstances alleged by Defendant Leonard, three problems exist to undermine her "equitable immunity" argument. <u>First</u>, even accepting her representations as true, the statements that Leonard alleges the Government made prior to her July 26, 2005 grand jury testimony were insufficient to create the kind of "agreement" necessary for informal, equitable immunity to attach. Importantly, taking her allegations as true, the statements cited by Leonard are not ambiguous, nor can they objectively be construed as a promise by the Government to bind itself not to prosecute Leonard or use her testimony against her in exchange for a waiver of her rights. According to Leonard, the Government made no mention of the word "immunity," there was no discussion of whether she would or would not be subject to prosecution, and no discussion was entered into whether her statements would or would not be used against her in the future. Indeed, Defendant Leonard – at the commencement of her grand jury testimony – was explicitly warned of her rights on the record, including her right not to incriminate herself, her right to counsel, and the risk that she could be prosecuted if her sworn testimony to the grand jury proved false. *See* Gov't's Opp'n, Ex. A (7/26/05 Grand Jury Tr. at 1:7-3:2) (excerpt where Defendant Leonard is informed of

her rights and promises to testify truthfully). Under the objective standard of contract formation, there is no basis in law for Leonard's contention that she reasonably believed that she had received a promise of immunity, nor is there any objective basis for finding that such a meeting of the minds between her and the Government actually occurred.

      Defendant Leonard attempts to skirt this issue by claiming that she did not receive a traditional "target" letter prior to her July 26, 2005 grand jury testimony, using this as support for her immunity argument. Two problems exist with this contention. First, a "target" is "a person to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." U.S. Attorney's Manual § 9-11.151. A witness is therefore not a "target" unless and until there is substantial evidence of his or her guilt *and* the prosecutor on the case has determined – to his or her satisfaction – that prosecution is not only warranted but is ready to proceed in light of all the facts and circumstances. Under these standards, and given the fact that Defendant Leonard was not actually provided a "target" letter until December 2005, it is reasonable to conclude that, while a person of interest, Defendant Leonard fell outside of the "target" category in July 2005. Indeed, it is quite possible that her grand jury testimony actually elevated her to such a status. Second, and equally importantly, the law is well-settled that the internal policies of the Department of Justice concerning "subjects" and "targets" do not create any enforceable rights. *See, e.g.*, *United States v. North*, Crim. No. 88-0080-02, 1988 WL 148491, at *1, n.2 ("The United States Attorney's Manual is not published in the United States Code or Code of Federal Regulations and none of its provisions are promulgated through the *Federal Register*. It does not have the force of law. Courts have held that internal Department of Justice policies do not create any substantive rights for defendants.") (citing cases). As such, the non-receipt of a target letter simply is insufficient for informal, equitable

immunity to attach.

Second, even assuming *arguendo* that some form of immunity agreement had been reached or could be enforced, such an agreement would be contingent upon the second prong of the "equitable immunity" side of the analysis – "the defendant has performed his side of the agreement." *McHan*, 101 F.3d at 1034. According to Defendant Leonard, prior to her grand jury testimony, the Government emphasized that if she told the truth, she would have nothing to worry about. However, the grand jury itself charged Leonard with conspiracy to obstruct its investigation. Among other overt acts in furtherance of the conspiracy, the grand jury found probable cause to believe that Defendant Leonard provided false and misleading information during her testimony. *See* Indictment ¶ 25. Accordingly, even if a putative immunity agreement existed or could be enforced, Defendant Leonard's attempted enforcement of such an agreement would fail due to the grand jury's determination that she failed to testify truthfully and/or completely before it on July 26, 2005. As such, her attempted enforcement of such a "deal" must now fail.

Third, and finally, a review of the cases cited by Defendant Leonard reveals the fundamental problems in her position. Each of the three cases relied upon by Defendant Leonard is simply inapposite to her present situation. In *United States v. Plummer*, the Government provided a letter to the defendant expressly promising him immunity in exchange for his cooperation. *See* 941 F.2d at 802-03. As such, there was no question as to whether an immunity agreement was actually formed; rather, the other issue was whether the immunity provided the defendant with use or transactional immunity. *Id.* at 803-06. In *United States v. Carter*, the defendant pleaded guilty, and his counsel provided a sworn statement that he conducted plea-bargaining with a prosecutor in the District of Columbia and obtained for the defendant an unambiguous promise of non-prosecution in any other jurisdiction in exchange for the defendant's agreement to cooperate and plead guilty.

*See* 454 F.2d at 427. Indeed, when sentenced pursuant to that plea deal, the extent of the defendant's cooperation was made known to the sentencing judge. *Id*. Despite these precautions, the defendant was subsequently charged in another jurisdiction for charges related to the plea agreement. *Id*. Even given the strong factual showing of the existence of an unambiguous agreement by the sworn statement of counsel, the Fourth Circuit remanded for a determination of whether any such promise was made and what the scope of the promise was. *Id*. at 428. Ultimately, a plain reading of *Carter* indicates that it cannot be read to provide any support for a theory that a defendant may obtain "equitable" immunity where her own allegations do not demonstrate that any immunity promise was made; moreover, the facts in *Carter* simply bear no relationship with the present circumstance, where Defendant Leonard has attempted to rely *post hoc* on circumstances to compel the enforcement of immunity upon her information and belief.

    The final case cited by Defendant Leonard in furtherance of her immunity argument, *Rowe v. Griffin*, 497 F. Supp. 610 (M.D. Ala. 1980), similarly provides no springboard of support. In *Rowe*, the State of Alabama charged a former cooperator with murder years after he provided cooperation against others involved in the same crime. *Id*. at 612. Among other things, the defendant (1) testified at several trials about his involvement in the murder; (2) was relocated and provided with a new job and identification by the FBI for his protection as a result of his extensive cooperation; and (3) the prosecutor on the prior case stated that the defendant was offered immunity. *Id*. at 611-13. The only question before the court was whether the admitted agreement extended beyond the term of the then-sitting State Attorney General. *Id*. at 612 n.3. The *Rowe* court concluded that the defendant clearly demonstrated an unambiguous agreement not to prosecute at any time, and that such an agreement had induced the defendant's substantial cooperation. *Id*. at

613. Given these contours, it is clear that *Rowe* does not support Leonard's claims. Indeed, *Rowe* does not create a rule of law whereby a defendant can be cloaked in "equitable" immunity when her own allegations concerning the government's alleged statements do not demonstrate that any promise of use or transactional immunity was ever made, or any consideration fulfilling the agreement actually provided by the defendant.

In sum, Defendant Leonard's immunity argument must fail. Objectively, there was no meeting of the minds; instead, the surrounding circumstances and the emphasis on her rights before the grand jury indicate that Leonard was not granted immunity in any form. Moreover, even if there was some form of tentative, informal, "equitable" immunity agreement that could be enforced against the Government, the actions of the grand jury indicate their belief that Defendant Leonard failed to meet her end of any such agreement, thereby negating any enforcement via specific performance. Finally, Defendant Leonard's cases are simply inapposite. Because Defendant Leonard's allegations, even if true, would be legally insufficient to compel the attachment of immunity, her contention must fail.[2]

      B.    *Fifth Amendment Right Against Self-Incrimination*

Defendant Leonard's second argument in favor of suppression is founded on her claim that her testimony before the grand jury on July 26, 2005 was taken in violation of her Fifth Amendment privilege against self-incrimination because of the coercive nature of the grand jury proceedings. *See* Def. Leonard's Mot. to Suppress at 5-6, ¶ 12. The Supreme Court has long acknowledged that

> [t]he [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have

---

[2] As such, because her argument fails even assuming the truth of the facts asserted, the Court need not conduct an evidentiary hearing into this issue.

been 'compelled' within the meaning of the Amendment.

*United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943) (footnote omitted); *Minnesota v. Murphy*, 465 U.S. 420, 427, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (reaffirming *Monia*).  Here, it is undisputed that Defendant Leonard was warned of her Fifth and Sixth Amendment rights at the commencement of her grand jury testimony, but failed to claim her privileges.  *See* Gov't's Opp'n, Ex. A (7/26/05 Grand Jury Tr. at 1:7-3:2) (excerpt where Defendant Leonard is informed of her rights and promises to testify truthfully).  Given such a failure to exercise her rights, it appears as though Defendant Leonard "waived" her rights or lost the benefit of her privileges.

However, Defendant Leonard maintains that the Supreme Court's decision in *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), supports an inference that – at least in some cases – testifying before a grand jury is a coercive activity, and that such a failure to exercise her rights must therefore be overlooked.  *See* Def. Leonard's Mot. to Suppress at 6-7, ¶¶ 13-14.  Contrary to her claims, the *Washington* Court specifically explained that it "has not decided that the grand jury setting presents coercive elements which compel witnesses to incriminate themselves."  *Washington*, 431 U.S. at 186, 97 S.Ct. 1814.  Indeed, the Court emphasized that "even assuming that the grand jury setting exerts some pressures on witnesses generally or on those who may later be indicted, the comprehensive warnings respondent received in this case plainly satisfied any possible claim to warnings."  *Id*.  Likewise, the expansive warnings provided to Defendant Leonard in this case at the outset of her testimony overcame any claimed coerciveness that may have been inherent in the grand jury process.  *See* Gov't's Opp'n, Ex. A (7/26/05 Grand Jury Tr. at 1:7-3:2) (excerpt where Defendant Leonard is informed of her rights and promises to

testify truthfully).

Accordingly, the Court must conclude that Leonard's decision to testify before the grand jury and thereby waive her privileges was knowing, intelligent, and voluntary – not coerced. Defendant Leonard was advised of her Fifth and Sixth Amendment rights, clearly stated that she understood them, and decided to answer questions instead of invoking those rights. While Defendant Leonard did claim the right to speak with counsel upon receiving a "target" letter in December 2005, she did not make such a claim in July 2005 prior to receiving such a letter. Nothing further was required of the Government, and the Government is therefore fully entitled to use that testimony in its prosecution. As such, Defendant Leonard's Fifth Amendment claims must fail, and her Motion to Suppress must be denied.

### III: CONCLUSION

For the reasons set forth above, the Court shall deny Defendant Leonard's Motion to Suppress Statements. An appropriate Order accompanies this Memorandum Opinion.

Date:   July 12, 2006

                                                      /s/
                                                COLLEEN KOLLAR-KOTELLY
                                                United States District Judge