UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | :  Cr. No 06-026 (CKK) |
| PETER R. TURNER and | : |
| | : |
| LATANYA ANDREWS, | : |
| Defendants. | : |

**GOVERNMENT'S COMBINED OPPOSITION TO
DEFENDANTS' MOTIONS FOR ACQUITTAL**

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its Opposition to the Defendants' Motions for Acquittal under Fed. R. Crim. P. 29(b) and (c). As demonstrated below, the motions lack merit, as the government presented sufficient evidence to support the jury's findings in every particular. Accordingly, this Court should respect the jury's unanimous verdict that each defendant violated 18 U.S.C. §§ 201 and 371.

**STANDARD OF REVIEW**

After a jury has returned a guilty verdict, a Rule 29 motion asks the Court to set aside that unanimous decision and enter a judgment of acquittal. Fed. R. Crim. P. 29. Such an extraordinary remedy is appropriate only in rare circumstances. As the D.C. Circuit has explained, if "reasonable [jurors] might or might not have a reasonable doubt as to guilt . . . the issue was properly submitted to them. It is not the function of appellate judges to weigh the evidence and decide that if they had doubts other reasonable persons were compelled to have the same doubts. If that were the test the jury of twelve would be relegated to the very low grade function of secondary fact finders." Crawford v. United States, 375 F.2d 332, 334 (D.C. Cir.

1967) (emphasis added); see also United States v. Fennell, 53 F.3d 1296, 1298 (D.C. Cir. 1995) (citing cases for the deferential standard applied to jury verdicts).

Accordingly, motions for judgment of acquittal are granted on the basis of insufficient evidence only if the court concludes, as a matter of law, that no reasonable juror could have convicted on the evidence presented. See United States v. Weisz, 718 F.2d 413, 438 (D.C. Cir. 1983). Put another way, the Court may grant a motion for judgment of acquittal if, and only if, "a reasonable juror must necessarily have had a reasonable doubt as to the defendants' guilt." United States v. Weisz, 718 F.2d at 437 (emphasis in original). Furthermore, when reviewing a motion for judgment of acquittal, the Court must view all evidence in the light most favorable to the Government. United States v. Kayode, 254 F.3d 204, 212-13 (D.C. Cir. 2001). The Court must also "accord[] the government the benefit of all legitimate inferences." United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983). In that regard, courts universally recognize that "a jury is entitled draw a vast range of reasonable inferences from evidence." United States v. Long, 905 F.2d 1572, 1576 (D.C. Cir. 1990).

## ARGUMENT

Neither Defendant can show that a reasonable juror must have had a reasonable doubt as to that Defendants' guilt on any Count. The thrust of each defendant's argument is that the government did not present evidence demonstrating (i) that Turner entered into an illegal agreement with any other person; (ii) that one such co-conspirator was Andrews in particular; and (iii) that Andrews "caused" the forged designation of beneficiary form to be filed in Vester Mayo's official personnel file (OPF). Although Andrews concedes that the government proved that the form was, in fact, forged and presented sufficient evidence as to the other aspects of its case, Turner does not appear to make any such concessions. Therefore, the government provides

the following analysis of some of the evidence from which the jury could have concluded beyond a reasonable doubt that Turner and Andrews were guilty on each Count.

> **I.  The Evidence was Sufficient for a Reasonable Jury to Convict Turner and Andrews on Count One -- Conspiracy.**

Both Turner and Andrews were charged in Count One with violating 18 U.S.C. § 371 by engaging in a conspiracy with four objects: to defraud the United States, to commit mail fraud, to receive a bribe, and to pay a bribe.  Indictment ¶ 6(a)-(d).  The jury found that the government proved beyond a reasonable doubt that (i) each defendant entered an agreement to commit one of the charged objects of the conspiracy, (ii) with at least one other person, plus (iii) one member of the conspiracy took at least one step in furtherance of the agreement.  Moreover, because the defendants were charged with a multiple-object conspiracy, a special verdict form was used in this case.  According to the verdict forms, the jury unanimously found that the government proved beyond a reasonable doubt that each defendant agreed to three of the four objects, but that Turner did not conspire to receive a bribe and that Andrews did not conspire to pay a bribe.  See Verdict Forms.  As shown below, the government presented more than sufficient evidence to support the jury's unanimous findings on Count One as to each defendant.

> 1.  Evidence of Forgery and Turner's Participation in the Fraud.

In concluding beyond a reasonable doubt that Exhibit 2, the original designation of beneficiary form purporting to have been signed and filed by Vester Mayo, was in fact a forgery, the jury had a substantial amount of evidence on which to rely. (Andrews concedes that the government proved the document was a forgery.)  Among other things, Nancy Cox, an expert in forensic document examination (Tr. 592:16-17), testified that she determined that Vester Mayo did not sign what appears to be her name on the form.  (606:13-18).  Likewise, she concluded

that James LeBron "very probably did not" write the signature that purports to be in his name on the form. (618:15-20).

The jury also could have relied on James LeBron's testimony. He testified that he did not sign the beneficiary form, and that he had never signed his name in the way it appears on the form. (355:19-22). The jury also may have credited LeBron's statements that he never would have accepted a beneficiary form bearing the many errors that Exhibit 2 shows on its face (357:4-16), and never would have allowed anyone else to sign his name on his behalf. (361:8-21). Further, the jury could have inferred from the nature of the errors on the form -- such as misspelling Lorenza Mayo's name and address, and confusing Vester Mayo's own social security number -- that they were not the type that Vester Mayo herself would have made had she filled out, signed, or submitted the form.

From these facts, it is clear the jury had substantial evidence supporting its decision that the form was forged and fraudulent. It is also readily apparent from the evidence that Turner, in particular, was personally involved in securing the fraudulent form and submitting it to the human resources section of the DVAMC. For instance, the jury could have credited Lorenza Mayo's testimony about Turner's activities after Vester Mayo's death. Lorenza Mayo testified that she witnessed Turner write two checks, Exhibits 8 and 9, drawn on Vester Mayo's personal checking account after her death, and that she saw him forge Vester Mayo's signature on those checks. (430:18-23; 433:1-4). The jury could also have relied upon Nancy Cox's expert testimony "associating" the person who forged Vester Mayo's name on the two checks with the person who forged the same name on the designation of beneficiary form. (606:2-8).

Further, the jury also could fairly drawn an adverse inference to Turner from the circumstances surrounding the forged form. The evidence showed that Turner was the only beneficiary listed on the form who had anything to gain by submitting it. That evidence included

4

testimony from James LeBron and Anthony Polizzi that the "order of precedence" legally dictated who would collect the life insurance proceeds on Vester Mayo's FEGLI account. Each witness testified that, if the designation of beneficiary form had not been submitted, Vester Mayo's next of kin would collect. (360:14-16 (LeBron); 540:3-25, 541:1-7 (Polizzi)). When a decedent has no spouse, as was the case with Vester Mayo, the parents of the decedent would collect the policy proceeds in equal shares. Id. The Court also provided judicial notice concerning the lawful order of precedence. (742:5-25, 743:1-4). Thus, absent the forged beneficiary form, Vester Mayo's parents, Roy and Lorenza Mayo, would together have collected 100 percent of the policy amount. Put another way, without the forged form having been submitted, Turner would have been entitled to none of the benefits. From this evidence, the jury was entitled to draw the inference that Turner, at least, was engaged in the fraudulent activity.[1]

In addition, other checks in Vester Mayo's name written after the time of her death and payable to Turner were in evidence, including one in the amount of $8,500. See Ex. 7. The jury could reasonable infer that the check was written by Turner to himself, and that it was part of the same scheme to obtain by fraud money from Vester Mayo's estate as his effort to obtain 50 percent of the FEGLI life insurance benefits through forgery.

For all these reasons, the jury acted well within the bounds of reason in concluding from the evidence (1) that the form was forged, (2) that Turner, at least, was involved in that forgery, and (3) that Turner therefore knew his FEGLI claim premised on the beneficiary form was fraudulent.

---

[1] In presenting the case to the jury, Turner's counsel seemed to argue that Lorenza Mayo may have had some financial motive to have forged the beneficiary form. This claim cannot withstand scrutiny in light of the facts presented at trial. Even were it a reasonable argument, however, the jury's decision to credit Lorenza Mayo, and to draw the opposite inference from the evidence concerning Turner's motives, is entitled to controlling weight under Rule 29's deferential standard of review.

5

      2.      <u>Evidence of Andrews's Participation.</u>

In determining that Andrews, in particular, agreed to help Turner commit one of the charged illegal objects, the jury was entitled to rely upon the accumulation of incriminating circumstances shown through documentary and testimonial evidence in the government's case. This evidence included the testimony of James LeBron concerning Andrews's inside access to and knowledge of the OPF filing area within the human resources section; the testimony of Lorenza Mayo, placing Andrews and Turner together during the relevant time; the documentary evidence concerning Andrews's employment history, bank account information, and receipt of the payment from Turner at the relevant time; and the testimony of Agent Robinson about Andrews's interview and her series of false explanations for that payment from Turner, demonstrating her consciousness of guilty and desire to conceal her involvement in the scheme.

James Lebron testified that the designation of beneficiary forms were kept in the OPFs, which in turn were maintained in a file room located in the human resources section. (344:8-22). LeBron testified that the door to that file room was unlocked during working hours, and sometimes after hours as well. (344:23-25, 345:1-2; 409:16-23, 410:5-14)  LeBron explained that the payroll section of the hospital adjoined the human resources section, was side-by-side with it, and that they shared a common main door to the outside hallway, but that there was no door between the two sections except an unoccupied reception area. (345:7-25; 346:1-20). Further, the main door to this area of the hospital was locked after hours. <u>Id.</u>  Lebron also testified, based on his knowledge and experience as a human resource specialist for more than ten years, that a person who worked in payroll as a payroll technician, such as Andrews, would know where the OPFs were maintained in the human resource section. (Tr. 348:17-25, 349:1-3).

The jury fairly could have concluded from LeBron's testimony that Turner would have been hard pressed to file the forged beneficiary form in the proper place within the OPF of

Vester Mayo in the human resources office of the hospital, and that Andrews had both the requisite access and knowledge to assist him in that endeavor.[2]

The jury could fairly have concluded from the testimony of James LeBron that there were several ways an insider such as Andrews could access the OPFs. First, Andrews could simply ask one of her work colleagues in the human resource section for an OPF. (Tr. 348:17-20). Second, she could wait until no one from human resources was watching and slip in undetected. (See Tr. 349:18-19 (file room not under guard)). Third, she could wait until after the last human resource specialist left for the day, and if the door was left unlocked -- as Lebron said happened from time to time -- walk in with no one the wiser. (Tr. 351:24-25, 352:1-2).

The jury could also reasonably conclude from LeBron's testimony that none of those opportunities was readily available to Turner acting alone. He was not a paid employee of the hospital and had no OPF of his own or any valid business with the human resource section. (Tr. 350:7-9, 18-22). He would not be able to get into the payroll/human resource area after hours, because the main hallway door was locked after hours. (Tr. 351:12-14). Nor would he have any pretense to ask a human resource specialist for Vester Mayo's OPF himself, unlike Andrews who could do so in her capacity as a payroll technician who occasionally have reason to request documents from those files. Id.

Further, the jury could fairly infer from the circumstances as described by LeBron that Turner, a non-employee, would not be familiar with the practices in the human resources section:

---

[2] Each defendant focuses on the phrase "to cause" in the Indictment's description of Andrews's role in the scheme. Turner MJOA at 2; Andrews MJOA at 5-6; Indictment ¶ 10. The language of the Indictment must be given its natural meaning. In the context of this case, the jury would be justified in finding that Andrews "caused" the form to be placed in Vester Mayo's OPF if it determined that Andrews merely provided assistance by which Turner was able to get the form in the file. The jury could conclude that her assistance was given in the form of inside information, other intangible aid, or by secreting the form into the OPF herself.

7

that is, who reviews the designation of beneficiary forms (and thus signs for their receipt on behalf of the agency), where they are maintained, and whether they are date-stamped when received.[3] On the other hand, the jury could draw a fair inference that a payroll technician who works side-by-side with the human resource specialists on a daily basis would reasonably have that requisite familiarity with local practices.

All of these circumstances support the jury's determination that there was an agreement between Turner and one other person who was familiar with the human resources section of the hospital: the would have been easy to breach by an insider, but much more difficult to breach in the way it was here by Turner acting alone.

Likewise, the jury was well-founded in its finding that Andrews, in particular, was the insider to whom Turner turned for assistance. A number of circumstances support the jury's decision. Of the possible insiders in the human resources and payroll sections, the evidence showed that Turner had a close relationship at the relevant time with Andrews. Lorenza Mayo testified that she observed Andrews associating with Turner at the time of Vester Mayo's death. (Tr. 424:15-25, 425:1-8). Agent Robinson testified that, when interviewed, Andrews said that she and Turner were "work friends," and that Vester Mayo and Turner would drive her to work. (Tr. 649:2-13). Further, of the possible inside accomplices in the human resources and payroll sections, the one who received money out of the insurance proceeds from Turner was Andrews,

---

[3] James LeBron testified that the date stamp machines kept by the human resource section are easily manipulated, as the keys that permit access to the tumblers were left in the keyholes of the machines. (Tr. 343:14-23). The jury could fairly conclude from that testimony that an insider such as Andrews would be aware of that vulnerability and would be in a position to exploit it. Moreover, as was developed during trial, the back of Exhibit 2 contains a date-stamp mark that does not correspond to the handwritten date of receipt (which the evidence further shows was false). (Tr. 356:16-25, 357:1-3). Rather, the date-stamp differs by one digit, or in other words, a single step on one tumbler. This combination of facts provides further support for the jury's conclusion that the designation of beneficiary form was filed as part of a scheme to defraud.

8

and that check was the first one Turner disbursed from the MetLife Total Control Account checkbook. See Ex. 16.

Moreover, according to a selection of Andrews's personnel records, introduced as Exhibit 44, as well as the testimony of James Lebron and Agent Robinson, Andrews was in fact working in the payroll section of the hospital at the time of the incident. Exhibit 45, a resume created by Andrews concerning her work history with the hospital, states that previously she held a clerk position with responsibility for handling and filing OPFs at the hospital. From that evidence the jury could reasonably have deduced, at minimum, that Andrews knew what an OPF was, the nature of the personnel records that "official personnel files" contain, and that the "personnel" or "human resources" section would use and maintain such files. Further, LeBron testified that payroll technicians, such as Andrews, could ask human resource specialists to access the OPFs when needed. (Tr. 348:17-20). He also stated that a payroll technician would know where the OPFs were kept. (Tr. 348:21-22). From all of this evidence the jury would be well supported in concluding that Andrews knew very well what the OPFs were, that they contained sensitive personnel records such as designation of beneficiary forms, and that they were located in the file room in the human resource section -- again, the same section whose records, according to LeBron, were stored a short and unimpeded walk from Andrews's work space. (345:7-25; 346:1-20).[4]

---

[4] For this reason, LeBron's testimony -- based on his experience working with the payroll section employees and sitting at a desk among them -- that a payroll technician such as Andrews would know where the human resources section kept the OPFs (Tr. 348:17-22) is not speculation. See Andrews MJOA at 6. It is rather a statement of fact concerning what LeBron knew about the responsibilities and activities of payroll technicians in his immediate work area, the result of his own observations and interactions with those technicians. The jury was entitled to credit or discredit LeBron's testimony concerning the degree of familiarity a payroll technician, such as Andrews, would have with the file room in which human resources maintained employee OPFs, and to give that testimony what weight it warrants. Under the deferential standard of review applicable to the defendants' motions, the jury's decision to accept

9

Ultimately, both defendants argue that the evidence on which the jury's verdict rests, when reviewed in piecemeal fashion, suffer from ambiguity or are subject to non-inculpatory interpretations. That argument, however, widely misses the mark at this stage of the proceeding. Rather, after viewing all the evidence collectively in the light most favorable to the government's case and according the government the benefit of every reasonable inference that can be drawn therefore, the accumulated evidence fills any supposed gaps or lacunae in the government's case. As shown, the sum of the direct and indirect evidence well supports the jury's finding in this case that, not only was Turner involved in the fraudulent scheme, but Andrews agreed to be his knowing coconspirator.

        3.        Evidence of the Illegal Objects of the Conspiracy.

The evidence on which the jury could conclude that Andrews and Turner agreed to commit at least one of the illegal objects charged in the Indictment is straightforward. The first object of the conspiracy was to defraud the United States by impeding certain lawful functions of OPM. There was ample evidence in the record that OPM enjoyed the lawful function of overseeing, regulating, and accounting for the FEGLI program. The jury could reasonably conclude that, by filing a false and fraudulent designation of beneficiary form, Andrews and Turner intended to impede or disrupt the purpose of the FEGLI program to provide life insurance benefits to the lawfully covered beneficiaries of deceased federal employees. Indeed, the evidence shows that Turner and Andrews accomplished that object. Lorenza Mayo and her husband did not receive the additional 50 percent of benefits to which they were entitled until approximately five years after Vester Mayo's death. (Tr. 574:3-5).

---

James LeBron's testimony on this issue should not be set aside post-verdict.

10

The jury also was justified in concluding that each defendant knew that illegal object. Once the jury concluded based on the evidence discussed above that the beneficiary form was forged and that Turner and Andrews were involved in filing it in Vester Mayo's OPF, the fraudulent purpose of the scheme is obvious: A forgery is, by its nature, a fraud, particularly when the forged document is a designation of beneficiary form naming one of the co-conspirators as a beneficiary.

Further, the jury would be justified in finding beyond a reasonable doubt that Andrews knew very well that the designation of beneficiary form was a forgery and not a valid form. The evidence demonstrated that Andrews was not a human resource specialist, but a payroll technician. See Ex. 44. As Andrews would know, a payroll technician would have no lawful purpose for assisting Turner in placing a beneficiary form in Vester Mayo's OPF at or near the time of her death.

The second charged object, mail fraud, is satisfied for the most part by the same evidence of fraud already discussed above. However, a few issues warrant a brief examination. First, a forgery, by definition, is an attempt to trick another into believing that a document was signed by someone who did not sign it -- thereby satisfying the government's obligation to present evidence on the "artifice or scheme to defraud." The evidence concerning the FEGLI regulations and "order of precedence" further supports the jury's conclusion that Turner and Andrew's intent in participating in that forgery scheme was to obtain money to which they were not legally entitled. Finally, the jury heard testimony and received documentary evidence upon which they could rely in concluding that the conspirators contemplated that the mails would likely be used in furtherance of the scheme. Anthony Polizzi testified about the mailings that occurred in order for Turner's fraudulent claim to be processed by OFEGLI. (Tr. 567:3-25, 568:1-17). Further, exhibits were introduced reflecting that interstate mailings occurred between

11

OFEGLI and Turner.  <u>See</u> Ex. 14 (statement of claim payment).  Taken together, the evidence was more than sufficient for the jury to find beyond a reasonable doubt that each defendant agreed to a conspiracy with the illegal object of violating the laws of the United States by committing mail fraud.

As to the final two illegal objects, the jury's finding that the defendants agreed to give and take bribes was also well supported by the record.  The government introduced the $1,000 check from Turner to Andrews, the first check he issued once the payment account from MetLife was received.  <u>See</u> Ex. 16.  The government presented evidence of Andrews's federal employment, making her a "public official."  The jury also was justified in concluding that, in return for joining Turner in the fraudulent scheme, Andrews performed or failed to perform official acts.  According to LeBron, Agent Robinson, and other documentary evidence, Andrews was a payroll technician who worked in the area of the hospital where the OPFs were maintained and safeguarded.  She violated her duties as an employee in that area when she assisted Turner in his effort to place the forged beneficiary form in Vester Mayo's OPF in that file room.

          4.      <u>Evidence of Overt Acts in Furtherance of the Conspiracy.</u>

Finally, Turner argues that the government did not present evidence from which the jury could conclude that an overt act was taken in furtherance of the conspiracy.  That claim is meritless.  In finding an overt act, the jury could have relied upon the evidence that Turner gave the first Total Control Account check to Andrews on February 1, 2001.  <u>See</u> Ex. 16.  It could also rely on the stamped information on the back of that check showing that Andrews cashed it within about a week.  <u>Id.</u>  It could also have relied on Agent Robinson's testimony concerning Andrews's attempts to conceal her involvement in the conspiracy by providing false information during her interview.  Finally, the jury could have relied on LeBron's testimony concerning

12

Turner's statements to him, which the jury could have concluded were intended to threaten a potential witness and thereby conceal Turner's involvement in the conspiracy.

### II. The Evidence Was Sufficient for a Reasonable Jury to Convict Andrews and Turner as to Counts Two and Three -- Bribery.

The same evidence supporting the jury's determination that Turner and Andrews, respectively, entered a conspiracy with the illicit object of giving and accepting a bribe, as discussed above, supports the jury's unanimous verdict that Andrews accepted, and Turner provided, a thing of value in exchange for an official act or joining in a fraud against the United States. Accordingly, the Court should not set aside the jury's unanimous verdict on Count Two as to Andrews or Count Three as to Turner.

### CONCLUSION

For the foregoing reasons, the Defendants' Motions for Acquittal should be denied, and the Court should affirm the jury's convictions of Turner and Andrews for violating 18 U.S.C. §§ 201 and 371.

>Respectfully submitted,
>
>EDWARD C. NUCCI,
>Acting Chief
>
>  /s/
>Daniel A. Petalas
>Ann C. Brickley
>Trial Attorneys
>Public Integrity Section
>Criminal Division
>United States Department of Justice
>10th Street and Constitution Ave, NW
>Washington, DC 20350
>202-514-1412
>202-514-3003 (facsimile)
>Dan.Petalas@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2006, a copy of the foregoing was served on the following counsel by electronic service:

James W. Rudasill, Jr., Esq.
717 D. Street, NW, Suite 310
Washington, DC 20004
rudasilljr7@aol.com
Counsel for Peter R. Turner

Nathan I. Silver, Esq.
P.O. Box 5757
Bethesda, MD 20824
nisquire@aol.com
Counsel for LaTanya Andrews

   /s/
Daniel A. Petalas
Trial Attorney