**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | )( | |
| | )( | **Criminal No. 06-26-01** |
| **v.** | )( | **Judge Kollar-Kotelly** |
| | )( | **Sentencing: July 23, 2007** |
| **PETER TURNER** | )( | |

**MEMORANDUM IN AID OF SENTENCING**

COMES NOW the defendant, Peter Turner, by and through undersigned counsel, and respectfully submits this memorandum to aid the Court in deciding what sentence to give him.  Accordingly, Mr. Turner would show:

1.      On July 31, 2006, a jury found Peter Turner guilty on one count of conspiracy (18 U.S.C., Section 371) and one count of bribery (18 U.S.C., Section 201).  The conduct charged as overt acts in the conspiracy count includes all the conduct at issue in the bribery count.  Mr. Turner did not testify at trial.

2.      Mr. Turner is sixty years old.  He is a Disabled American Veteran.  Mr. Turner joined the Army out of high school and ended up serving two tours of duty in Vietnam from 1969 to 1971.  Some of Mr. Turner's disabilities are classified as service connected.  Apart from some minor incidents that occurred thirty-eight years ago when Mr. Turner was still in the Army, Mr. Turner has no criminal history at all.  Mr. Turner is currently in very poor health.  His conditions are chronic and are not expected to improve.  Mr. Turner receives treatment from the Veterans Administration Medical Center (VAMC) here in Washington, D.C.  Additionally, because his condition has recently been getting worse, Mr. Turner has been receiving care from several private specialists as well.  It should also be noted that Mr. Turner has some significant mental

health issues—though it does not currently appear that these issues are quite as serious as

Mr. Turner's medical issues.

    3.    Mr. Turner's primary physician at the VAMC is Martin Balish, M.D.,

Ph.D.  On March 14, 2007, Dr. Balish prepared a letter detailing Mr. Turner's medical

and mental health issues.[1]  A copy of this letter is attached.  Attachment One, Letter from

Dr. Balish. The primary concerns that Dr. Balish raises in his letter concern a number of

"chronic problems from which [Mr. Turner] will not improve," including:

    a.    congestive heart failure.
    b.    severe neuropathy rendering Mr. Turner largely unable to walk.
    c.    inability to control urinary and bowel functions.
    d.    degenerative joint disease (rheumatoid arthritis).
    e.    lupus.
    f.    type 2 diabetes that is not under control.
    g.    required use of oxygen and CPAP (oxygen pump) at night.
    h.    Post-Traumatic Stress Disorder (related to service in Vietnam, 1969-
            1971).

Id. at 1-2.

    4.    Because of Mr. Turner's medical condition, Dr. Balish has put in an

application for Mr. Turner to receive in-home nursing care through the VAMC.  A copy

of the examination form that Dr. Balish completed as part of the application is attached.

Attachment 2, Examination for Housebound Status.  In the examination form, Dr. Balish

notes that, in addition to needing in home care because of his medical problems, Mr.

Turner also needs case because he has "difficulties dressing and feeding [himself]" and

because he has "loss of continence bowel and bladder."  Id.

    5.    In addition to receiving medical services from the VAMC, Mr. Turner also

receives medical treatment from Roy Levinson, M.D.  On May 22, 2007, Mr. Turner saw

---

[1] Mr. Turner's health situation appears to have gotten more complicated since Dr. Balish wrote this letter.
Accordingly, Dr. Balish is in the process of preparing an updated letter that will provide more current
information.  As of the filing of this memorandum, however, this updated letter was not available.  The
updated letter will be filed with the Court as soon as it becomes available.

Dr. Levinson for a follow-up visit.  After this visit, Dr. Levinson wrote a letter to Edwin

Messey, M.D., a specialist who has also been treating Mr. Turner.  A copy of the letter

that Dr. Levinson sent to Dr. Messey on Mr. Turner's behalf is attached.  Attachment 3,

Letter from Dr. Levinson.  In his letter, Dr. Levinson notes that Mr. Turner has a

"formidable array of medical issues," but he expresses his particular concern regarding

Mr. Turner's "chronic obstructive pulmonary disease" and "diffuse hematologic

complaints and neurologic complaints."  Id. at 2.

6.       These "diffuse hematologic complaints" turned out to more than just

complaints.  Five days after seeing Dr. Levinson, Mr. Turner was determined to be in

acute renal failure and was immediately hospitalized.  Mr. Turner's hospitalization lasted

from May 29, 2007 to June 5, 2007.  While hospitalized, Mr. Turner was treated by Mark

Thomas, D.O.  A copy of the discharge summary that Dr. Thomas prepared when Mr.

Turner was released from the hospital is attached.  Attachment 4, Discharge Summary.

This discharge summary provides further evidence of the "formidable array of medical

issues" from which Mr. Turner is suffering.  Additionally, the fact that Mr. Turner is now

having to be hospitalized for these issues underscores the fragility of his condition.

7.       Undersigned counsel was appointed to represent Mr. Turner on February

6, 2007.  Counsel feels that Mr. Turner's health now—just five months later—is worse

than it was when counsel first met Mr. Turner.

8.       Mr. Turner served in the United States Army from 1966 to 1971.  As

already stated, while in the Army, Mr. Turner did two tours of duty in Vietnam.  During

these tours of Vietnam, Mr. Turner was exposed to significant combat.  Mr. Turner only

speaks about his time in Vietnam in an elliptical fashion; however, it is clear that his

experiences in Vietnam were very negative.  As a result of his service in Vietnam, Mr.

Turner developed post-traumatic stress disorder (PTSD).  This condition has had a

significant impact on Mr. Turner's adult life.  Even now, Mr. Turner still takes several

psychotropic medications to treat his PTSD.  See Attachment One, Letter from Dr. Balish

at 2.

9.    Because of his medical and psychiatric problems, Mr. Turner has, since

1991, been classified as fully disabled for the purposes of receiving benefits from the

Social Security Administration.  Also, Mr. Turner has been classified as a fully disabled

veteran with the Veterans Administration.  Again as already stated, some of Mr. Turner's

disabilities are categorized as "service connected."

10.    While Mr. Turner has been unable to work since 1991, Mr. Turner has

nevertheless remained active and worked hard to give back to the community, devoting

himself to activities to promote the welfare of other Disabled American Veterans.

11.    On July 2, 2007, undersigned counsel spoke with Paula Gorman.  Ms.

Gorman is the Director of Volunteer Services at the VAMC.  Ms. Gorman reports that

Mr. Turner became a volunteer driver with the VAMC in August of 2000.  As a volunteer

driver, Mr. Turner transported disabled veterans to and from their medical appointments

at the VAMC and other medical facilities.  Not only would Mr. Turner transport people

from the local area, but he would also transport people from as far away as North

Carolina and New York.  Mr. Turner quit being a volunteer driver for the VAMC in

August of 2006.  Ms. Gorman reports that, during his tenure as a volunteer driver, Mr.

Turner logged 9,877 volunteer hours with the VAMC.  This means that, for the six years

he was volunteering with the VAMC, Mr. Turner was putting in well over thirty hours

each and every week.  Ms Gorman states that, while Mr. Turner was volunteering with

the VAMC, he was the "top driver," putting in more miles and making more trips than

any other driver. Because the offenses for which Mr. Turner was convicted involve the
VAMC, Ms. Gorman is aware of Mr. Turner's legal situation. Nevertheless, she stresses
that Mr. Turner is a "good man" with "good intentions."

12.    Because of Mr. Turner's medical issues, there is obviously a real concern
that incarceration will seriously disrupt the medical treatment that Mr. Turner is currently
receiving. There is also a concern that, if he is incarcerated, Mr. Turner may not get all
the medical treatment that he needs. However, it is also recognized that punishment is a
legitimate component of any sentence. It should be noted at this point that the Sentencing
Guidelines authorize the Court to sentence Mr. Turner to home detention in lieu of actual
imprisonment. U.S.S.G., Section 5H1.4 states that "an extraordinary physical
impairment may be reason to impose a sentence below the applicable guideline range."
This provision then goes on to specifically note that, "in the case of a seriously infirm
defendant, home detention may be as efficient as, and less costly than, imprisonment."
Elsewhere, the Guidelines state, "Home detention may be imposed as a condition of
probation or supervised release, but only as a substitute for imprisonment." U.S.S.G.,
Section 5F1.2. The guidelines specifically contemplate that persons placed on home
detention can be allowed to leave their home for needed medical care. Id., Application
Note 1.

13.    Because of Mr. Turner's medical issues, undersigned counsel has spent a
considerable amount of time reviewing the policies of the Bureau of Prisons (BOP) for
dealing with inmates who have serious health problems. However, counsel has only been
able to develop a vague understanding of how the BOP would likely deal with Mr.
Turner. Still, counsel would note that BOP Program Statement P6270.01, Section 7b
states, "Most acute care requiring hospitalization of the inmates will be provided in a

community hospital near the institution." The BOP also maintains Medical Referral

Centers (MRC's) that are evidently able to provide medical services that the other

institutions are not able to provide. It seems likely that Mr. Turner would be placed at

one of these MRC's. See BOP Program Statement P6270.01, Section 5 ("cases requiring

long-term care are considered appropriate MRC referrals"). It is counsel's understanding

that one of the main reasons that MRC's are better equipped than other institutions to

handle inmates with serious health problems is because they are located near community

hospitals with which they have close relationships. Accordingly, they are well positioned

to make active use of those hospitals in providing for the care of their inmates. Given the

seriousness and fragility of Mr. Turner's condition, it appears that, even if Mr. Turner

were sentenced to a period of incarceration, he may very well end serving a significant

portion of his sentence not in a penal institution but in a community hospital.

       14.     It is submitted that placing Mr. Turner on home detention in lieu of

incarceration is the right thing to do in this case. This would allow Mr. Turner to

continue to get the medical care that he is currently receiving. Given Mr. Turner's fragile

and apparently deteriorating condition, continuity of care is extremely important. Mr.

Turner has been receiving medical care from the VAMC for a number of years, and the

doctors there are intimately familiar with him and his conditions. It is believed that Mr.

Turner's guideline range is 15-21 months. See supra at 8-12. If Mr. Turner is

incarcerated, it will mean not only that his medical care will be completely interrupted

now but also that, in the near future, it will be completely interrupted again when he

comes back into the community after serving his sentence. Such a complete and repeated

loss of continuity of care is a harsh deprivation to impose. Also, it should be pointed that

incarceration for someone in Mr. Turner's condition is going to be significantly harder

than it would be for someone who is healthier.  Moreover, placing Mr. Turner on home

detention and allowing him to continue to receive the medical treatment that has already

been established for him will undoubtedly save the BOP a considerable amount of

money.

        15.      Mr. Turner is not asking the Court to reduce the actual amount of time that

he must serve.  Moreover, Mr. Turner is not asking the Court to do something that would

effectively shorten the period of supervision that he would have undergone had he been

sentenced to actual prison time.  Rather, Mr. Turner is simply asking the court to order

him to serve his sentence in home detention instead of in a federal institution.  It is

submitted that the Court can insure that Mr. Turner is not getting any undue break by first

determining both the sentence of incarceration and the period of supervised release that

the Court would give him, then adding these two periods of time together into one total,

and then ordering probation for period of time equal to that total.[2]  As a condition of

probation, the Court should order that Mr. Turner be placed in home detention for

whatever period the Court was going to sentence him to incarceration.  It should be noted

that Mr. Turner is eligible to be placed on probation for up to five years, 18 U.S.C.,

Section 3561(c)(1), and it is believed that the period of incarceration and the period of

supervised release that the Court would otherwise give Mr. Turner will not add up to

more than five years.

        16.      It is possible that the government may argue that sentencing Mr. Turner to

home detention instead of prison time will mean that he will escape a portion of the

punishment that he deserves.  However, it must be emphasized that, if Mr. Turner is

---

[2] Mr. Turner's guideline range is in Zone D of the Sentencing Table.  See infra at 12.  Ordinarily, because of this, the Court would not, consistent with the Guidelines, be able to order probation for Mr. Turner.  See U.S.S.G., Section 5B1.1 & Application Note 2; U.S.S.G., Section 5C1.1(f).  However, as already stated, U.S.S.G. 5H1.4 specifically authorizes the Court to depart downwardly from a defendant's guideline range so that he can be placed on home detention because of his medical condition.

sentenced to prison time, it will be unfairly punitive for him because of the additional

deprivations and hardships it would necessarily cause him to suffer.  As already stated,

incarceration would cause a complete disruption and loss of the important medical

treatment that Mr. Turner is currently receiving.  Also, incarceration for someone in Mr.

Turner's condition is going to be much harder than it would be for the vast majority of

inmates.  While it might be somewhat unfair to the government to sentence Mr. Turner to

home detention instead of prison time, it would be even more unfair to Mr. Turner to

sentence him to prison time instead of home detention.  This is difficult case for which

there is no satisfactory solution.  However, given that Mr. Turner's sentence is not going

to be particularly long , imposing the special deprivations and hardships that

incarceration would mean for Mr. Turner simply to preserve a fairly short prison sentence

is not warranted.

17.    Mr. Turner's Base Offense Level is 10.  It should be noted that, under the

current version of the United States Sentencing Guidelines Manual (Guidelines Manual),

Mr. Turner's Base Offense Level would be 14.  U.S.S.G., Section 2C1.1(a)(1).  However,

this section of the Guidelines Manual was amended in 2004.  Prior to 2004, Mr. Turner's

Base Offense Level was 10.  See U.S.S.G., Section 2C1.1, Historical Notes.   All of the

conduct for which Mr. Turner was convicted occurred well before 2004.  Accordingly, to

now make Mr. Turner's Base Offense Level 14 instead of 10 would violate the ex post

facto clause.  U.S. Const., Art. I, Section 9; see also Beazell v. Ohio, 269 U.S. 167, 169-

70 (1925) ("a statute… which makes more burdensome the punishment for a crime after

its commission… is prohibited as ex post facto").

18.    Mr. Turner and his codefendant are alleged to have made efforts in 2005

and 2006 to conceal their illegal activities and prevent them from being prosecuted.  See

Pre-Sentence Investigation (PSI) Report at 4.[3]  However, even if these allegations were true, it still would not mean that the conspiracy for which Mr. Turner was convicted continued until after 2004.  As the Supreme Court made clear fifty years ago, where acts to conceal a conspiracy and prevent it from being prosecuted are done after the objectives of the conspiracy have already been achieved, such acts cannot properly be considered a part of the conspiracy because they were not actual objectives of the conspiracy at the time that the conspiratorial agreement was formed.  Grunewald v. United States, 353 U.S. 391, 402-06 (1957).  Indeed, in Grunewald, the Court noted that to rule otherwise would mean that a conspiracy could be indefinitely lengthened just because the conspirators keep it secret.  This would run counter to the Court's admonition that "we will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions."  Id. at 404-05.

19.    The PSI Report recognizes that Mr. Turner's claim that the offenses for which he was convicted were completed prior to 2004 is "reasonable."  PSI Report at 16. Nevertheless, referencing Mr. Turner and his codefendant's alleged efforts to frustrate prosecution in 2005 and 2006, the PSI Report still makes use of the latest version of the Guidelines manual and calculates Mr. Turner's Offense Level at 14—not 10 as it should be.

20.    The crimes for which Mr. Turner was convicted resulted in a monetary loss of $20,500.  Therefore, Mr. Turner acknowledges that his Offense Level should be increased by 4 points.  See U.S.S.G., Section 2C1.1(b)(2) and 2F1.1 (2000 Edition).[4]  Mr.

---

[3] The PSI Report has been revised three times now, the last time being on June 2, 2007.
[4] Because the offenses for which Mr. Turner was convicted occurred in late 2000 and early 2001, the 2000 edition of the Guidelines Manual is being referenced here.  However, even if the latest edition of the Guidelines Manual is used, Mr. Turner's Offense Level would still have to be increased by 4 points because of the amount of monetary loss involved.  See U.S.S.G., Section 2C1.1(b)(2) and 2B1.1(b)(1)(C) (2006 Edition).

Turner submits that there are no other grounds for increasing his Offense Level.  Thus, his total Offense Level is 14.

21.    The PSI Report indicates that Mr. Turner should be given a 2-point increase for obstruction of justice pursuant to U.S.S.G., Section 3C1.1.  PSI Report at 5. The PSI Report indicates that Mr. Turner "confronted" a witness who was testifying before the grand jury regarding this case and threatened him by saying "that he was troubled by the investigation and, in the old days, would have 'gone home to get [his] guns.'"  PSI Report at 4.  The trial transcripts in this case make it clear that that the conduct the PSI is referring to concerns a conversation that occurred between Mr. Turner and a man by the name of James Lebron.

22.    At trial, the government called Mr. Lebron as a witness.  Tr. at 329 (6/25/06).  Mr. Lebron is an employee of the VAMC.  Id. at 331.  Mr. Lebron indicated that, while the crimes at issue here were still under investigation, law enforcement agents interviewed him concerning the case.  After this interview, Mr. Lebron informed Mr. Turner that an agent had come to his office and copied some documents relevant to the investigation.  This conversation occurred in 2003.  Id. at 367-72.  Evidently several years later, Mr. Lebron was walking down a hallway at the VAMC when he passed by Mr. Turner, who was sitting on a bench.  While Mr. Lebron was walking past him, Mr. Turner asked Mr. Lebron if he had "heard anything else [about the investigation]."  Id. at 377.  Mr. Lebron further testified:

> And then he made a comment—well, I think it was the constant messing with him and what do they want.  And it was something about if it had been back in the old days, the things would be different or whatever, and that they just don't know him because he's PTSD and that he might just go home and get his gun.

Id.

23.     Undersigned counsel spoke by telephone with Mr. Lebron on May 9, 2007 and again on May 15, 2007.  Mr. Lebron remembers the conversation that he had with Mr. Turner in which Mr. Turner made the comment about getting his gun.  However, Mr. Lebron emphatically maintains that he did not feel that Mr. Turner was attempting to intimidate him or even making any kind of real threat against the people who were investigating the case.  Mr. Lebron states that, if Mr. Turner's comments are now being viewed as having been intended to threaten and intimidate, they are being taken completely out of context.  Mr. Lebron states that, when Mr. Turner made the comments, he was only "venting" and expressing "his frustration" with the fact that he was being investigated.  Mr. Lebron states that the conversation was not a hostile one and that he and Mr. Turner parted on good terms.  Moreover, he points out that, at the VAMC, where most of the people—like he and Mr. Turner—are veterans of war, it is common for people to "talk tough" and use somewhat violent terminology when discussing matters among themselves, and he indicates that it would be unfair (and incorrect) to read too much into this.  Mr. Lebron has written a letter to counsel regarding his conversation with Mr. Turner.  A copy of the letter is attached.  Attachment 5, Letter from Mr. Lebron.

24.     Mr. Turner should not be given a 2-point increase in his Offense Level because of the comment he made to Mr. Lebron about getting his gun.  Unquestionably, Mr. Turner used violent language when he was talking with Mr. Lebron.  However, while it might be tempting to automatically assume that, because he used violent language, he should therefore be given the 2-point increase, it is submitted that, before giving an increase that will result in additional incarceration, more careful scrutiny is required.  First, it is clear not only that Mr. Lebron did not feel threatened or intimidated by Mr. Turner's comment but also that he did not feel that Mr. Turner was even trying to

11

threaten or intimidate him.  Since it would be unfair to impose a sensibility that these two men do not share in evaluating the meaning of a conversation to which they were the only parties, Mr. Lebron's view of the conversation should not be second guessed.  Second, it should be pointed out that, even if it is believed that Mr. Turner was making a threat when he made the comment about the gun, this still does not mean that he was trying to obstruct justice.  To the extent that Mr. Turner's comment can even be viewed as constituting a threat, it must be recognized that the threat was directed not towards Mr. Lebron but towards the "they" who were investigating the case.  While a threat against an absent third person may still legally be a threat, such a threat is nevertheless incapable of influencing the conduct of the person to whom it is directed since that person would not even be aware that he has actually been threatened in the first place.  Thus, absent a showing that the persons to whom the supposed threat was directed knew of the threat or were likely to be made aware of the threat, the threat cannot be viewed as an obstruction of justice—actual or intended.

        25.        Mr. Turner's Criminal History Score is zero, and he is therefore in Criminal History Category I.  It appears that, in 1971, Mr. Turner was convicted of larceny and, relatedly, the attempted bribery of the Military Police Officer who arrested him.  These convictions were in a military court.  It further appears that Mr. Turner was given some sort of clemency for his conduct.  This conduct occurred right after Mr. Turner had returned to the states after doing his second tour of duty in Vietnam.  Apart form these convictions thirty-eight years ago, Mr. Turner has no criminal history at all. See PSI Report at 6.

12

26.     Because Mr. Turner's Total Offense Level is 14 and his Criminal History

Category is I, his guideline sentence is 15-21 months.  This is in Zone D on the

Sentencing Table.

**CONCLUSION**

Mr. Turner is a sixty-year-old man who is in very poor health and looking at a

guideline sentence of 15-21 months.  Because of Mr. Turner's health, sentencing Mr.

Turner to prison time would mean that other unintended and severe punitive

consequences would also necessarily be imposed on him as well.  First, if Mr. Turner

were incarcerated, it would cause a complete disruption and loss of the important medical

care that he is currently receiving.  Second, incarceration for someone in Mr. Turner's

condition will be far harder than incarceration for most other inmates.  It is recognized

that Mr. Turner deserves to be punished.  However, this is not the only factor that is to be

considered.  Accordingly, instead of being sentenced to prison time, Mr. Turner should

be sentenced to home detention.  This may not be a perfect solution, but it is the best one

that can be had under the circumstances.  While it might be argued that a sentence of

home detention is overly lenient, it must be recognized that a sentence of prison time will

be overly severe.  Indeed, a sentence of prison time will be much more severe than a

sentence of home detention will be lenient.  Accordingly, to impose severe hardships on

Mr. Turner just for the sake of preserving a fairly short prison sentence is not warranted.

Mr. Turner is a Disabled American Veteran who served two combat tours of duty

Vietnam from 1969-1971.  Because of his service in Vietnam, Mr. Turner has suffered all

his life from PTSD.  Mr. Turner has devoted himself to helping other Disabled American

Veterans and has spent six of the last seven years volunteering full-time as a driver for

the VAMC.  Apart from some minor incidents that occurred thirty-eight years ago when Mr. Turner was still in the Army, Mr. Turner has no criminal history at all.

WHEREFORE, the defendant, Peter Turner, respectfully requests that this Court sentence him to home detention in lieu of prison time.  Specifically, Mr. Turner requests that the Court exercise the authorization provided to it by the Sentencing Guidelines to depart downwardly because of Mr. Turner's health and place him on probation.  As a condition of probation, Mr. Turner requests that he be placed on home detention for a period that equals the prison time that the Court would have otherwise given him.  Mr. Turner requests that his probationary sentence be fashioned such that, after he is off home detention, the amount of probation remaining equals the period of supervised release the Court would have otherwise given him.

Respectfully submitted,


_____/s/_____
Jerry Ray Smith
Counsel for Peter Turner
717 D Street, N.W.
Suite 400
Washington, D.C. 20004
Phone: (202) 347-6101

14