IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 06-026 (CKK) |
| v.    ) | |
| ) | Government's Response to Defendant's |
| PETER R. TURNER,    ) | Sentencing Memorandum |
| Defendant.    ) | |
| _____ ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S
SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, respectfully submits

its Reply to the Sentencing Memorandum of the defendant, Peter Turner.  The government filed its

Sentencing Memorandum concerning both defendants Andrews and Turner on January 26, 2007

[Docket No. 67].  After Turner obtained new counsel, The court entered a briefing schedule, and

the defendant filed his Sentencing Memorandum on July 6, 2007 [Docket No. 101].  The

government now submits this Reply pursuant to the Court's briefing schedule to address two

matters raised in the defendant's memorandum that were not covered previously in the

government's memorandum: that is, the defendant's challenge to the application of the 2006

edition of the Guidelines to his offense conduct, and his request for a downward departure and

home confinement in lieu of incarceration.  As explained below, both contentions should be

rejected.

I.    **Application of the 2006 Edition of the Guidelines to the Defendant's Offense Conduct
      Does Not Violate the Ex Poste Facto Clause**

   A.    **Statement of Relevant Facts**

The Indictment in this case specifically charged that the defendants engaged in a

conspiracy with multiple purposes, one of which was "to knowingly and willfully defraud the

United States by impairing, impeding, and defeating the lawful functions and duties of the OPM

and the FEGLI program." Indictment ¶ 6(a). The Indictment alleged that one of the objects of the

conspiracy to defraud the OPM was to conceal the existence of the conspiracy:

> It was the object of the conspiracy for defendants PETER R. TURNER and
> LATANYA ANDREWS, together with others, to obtain money and property under
> false and fraudulent pretenses from the FEGLI program. It was also an object of
> the conspiracy for defendant PETER R. TURNER to make payments to defendant
> LATANYA ANDREWS after obtaining money and property under false and
> fraudulent pretenses from the FEGLI program. It was also an object of the
> conspiracy to conceal the conspiracy itself and the acts committed in furtherance
> thereof.

Indictment ¶ 7. The Indictment also alleged the manner and means by which the conspirators

attempted to accomplish their object of defrauding the OPM, including the necessity of concealing

the scheme:

> It was further a part of the conspiracy that the conspirators would and did take steps
> to hide and conceal their role in the conspiracy and the fraudulent claim for life
> insurance benefits by, among other methods, threatening witnesses and providing
> false statements to federal investigators and the Grand Jury.

Indictment ¶ 13.

In its case in chief, the government presented exhibits and the testimony of witnesses

regarding the nature, purpose, and rules of the OPM's FEGLI program; the money market account

that OFEGLI established for the defendant's use; the lawful function of the OPM to oversee and

regulate the FEGLI program; and the law enforcement and administrative responsibility of the

special agents of the OPM Office of the Inspector General (OIG) to investigate fraud, waste, and

abuse in OPM programs such as the FEGLI program.

The government called James LeBron, a human resource specialist at the VA Hospital.

LeBron testified that OPM administers and regulates the FEGLI program, and pays a portion of the

insurance premiums for employees who are covered under that program. Tr. at 332-33. He further

testified that the VA Hospital is required to submit a report to OPM verifying the death of the

covered employee. Tr. at 354. He testified that, if a designation of beneficiary form is determined

2

to be invalid, then the order of precedence will determine the proper beneficiary.  Tr. at 360-61.

Also admitted under Fed. R. Evid. 803(5) as a recorded prior recollection was an affidavit of

LeBron, in which LeBron relayed an incident when the defendant approached LeBron at the VA

Hospital shortly after LeBron was interviewed by a special agent on this case.  Tr. at 370-71.

LeBron's affidavit indicated that the defendant asserted to him that Turner was being investigated

for the designation of beneficiary form, but that he "ain't done shit."  Tr. at 371.

The government also called Lorenza Mayo, the mother of the decedent.  She testified that,

after recognizing the designation of beneficiary form on file with the personnel office of the VA

Hospital was a forgery, she confronted Turner.  Tr. at 442-43.  She testified that he claimed that

Vester Mayo did not fill in the body of the designation form, but that she did sign it.  Tr. at 443.

Ms. Mayo also testified that, shortly after her daughter's death, the defendant threatened to burn

down the house at 3200 Amador Dr. if Ms. Mayo failed to provide him with certain medical

records relating to another insurance claim on Vester Mayo's death. Tr. at 443-44.  In addition, she

testified that she witnessed the defendant forge Vester Mayo's name on two checks drawn on

Mayo's personal checking account while she was staying at the residence at 3200 Amador Dr. to

settle her daughter's affairs.  Tr. at 430, 432-33.  She also testified that her husband, Roy Mayo,

did not receive the additional fifty percent payment on the FEGLI insurance policy until March

2005.  Tr. at 449.

The government also presented the testimony of Anthony Polizzi, a claims manager with

OFEGLI.  Tr. at 525.  Polizzi testified that the FEGLI program was created through an act of

Congress, the FEGLI Act.  Tr. at 525, 526.  He testified that OPM oversees the FEGLI program

and issues the regulations that guide OFEGLI in the administration of the program.  Tr. at 526,

563.  OPM is the policyholder on the group life insurance policy through which the program

operates.  Tr. at 527.  Polizzi further testified that the designation of beneficiary form is an OPM

form. Tr. at 528. He stated that for a designation form to be lawful and valid, among other things,

it must be signed by the decedent and received by the agency before her death. Tr. at 534, 539. If

those conditions are not met, the designated beneficiary on the form is not entitled to any insurance

proceeds. Tr. at 534, 539. Further, if an insured's name is signed by anyone other than the insured

employee herself, the form is invalid. Tr. at 539. In such a case, OFEGLI must instead apply the

order of precedence to determine the correct beneficiary. Tr. at 540. Polizzi also explained that

payment is not made in a lump sum, but instead through a money market checking account set up

in the name of the beneficiary. Tr. at 543. Polizzi discussed the matter of the additional fifty

percent payment to Roy Mayo. Tr. at 574. He testified that the payment to Mr. Mayo was not

made until 2005, four or five years after the initial disbursement to Turner. Tr. at 574. Polizzi

testified that "[w]hen O-FEGLI overpays a claim we are obligated to try and recover any

overpayment proceeds." Tr. at 574. He also testified that OFEGLI is mandated to process claims

under the program quickly and with administrative efficiency. Tr. at 584.

Agent Robinson also was called by the government and provided testimony concerning her

investigation. She testified that she was an agent of the OPM-OIG. Tr. at 641. She indicated that

her responsibilities as an OPM-OIG agent include not just law enforcement activities, but also

overseeing programs of the OPM and investigating fraud, waste, or abuse. Tr. at 642.[1] She

described the activities she undertook during the investigation, some of the evidence she

uncovered, and her November 2005 interview of defendant Andrews. Tr. at 651. It was during

that interview that defendant Andrews attempted to mislead the OPM-OIG investigators by lying

---

[1] The Inspector General Act of 1978 provides that special agents of the Offices of Inspectors General, such as Agent Robinson, are charged with regulatory/administrative responsibility to conduct audits and investigations into fraud, waste, and abuse in agency programs and to promote efficiency in those programs, in addition to their law enforcement duties. See 5 U.S.C. App. § 4.

about the scope of her relationship with Turner, her receipt of money from him, and the purpose of

that payment.  Tr. at 651-53.

B.     **Legal Analysis**

In United States v. Grunewald, 353 U.S. 391 (1957), the Supreme Court held that acts

performed after the accomplishment of a conspiracy's primary purpose, if they furthered the

conspiracy only by concealing an already complete crime as part of a subsidiary conspiracy,

generally are not considered part of the original conspiracy.  Id. at 401-02.  Grunewald recognized,

however, that some subsequent acts of concealment may form part of the original conspiracy.  Id.

at 405.  The Court recognized what it considered a "vital distinction" between "acts of

concealment done in furtherance of the main criminal objectives of the conspiracy" – which are

part of the conspiracy – and "acts of concealment done after these central objectives have been

attained, for the purpose of covering up after the crime" – which are not part of the original

conspiracy absent proof of an express agreement to cover up.  Id.  Even where no express

agreement to conceal is proven, the Grunewald Court recognized that subsequent acts of

concealment will nonetheless extend the duration of a conspiracy when "the successful

accomplishment of the crime necessitates concealment."  Id.[2]

---

[2]  The defendants in Grunewald were convicted of conspiring to defraud the United States
with reference to tax matters.  353 U.S. at 393. The Court held that the principal objective of the
conspiracy was the obtaining of "no prosecution" rulings from the Internal Revenue Service (the
"IRS").  Id. at 406.  These rulings were obtained outside the limitations period, but the
subsequent acts of concealment – which included destroying records and asking witnesses not to
testify before the grand jury – were not.  Id. at 395-96.  The Court held that the conspiracy
conviction was barred by the statute of limitations because "no agreement to conceal the
conspiracy after its accomplishment was shown" or could be implied on the evidence.  Id. at 406.
Although the Court found sufficient evidence to support a broader conspiracy to immunize the
taxpayers entirely from prosecution for tax evasion, which would have been furthered by the acts
of concealment, id. at 408-11, it could not say that this theory of the conspiracy had been
adequately submitted to the jury, id. at 411-15.  The Court therefore remanded the case for a new
trial.  Id. at 415.

In determining the scope and duration of a conspiracy, the language of the Indictment is controlling. United States v. Hitt, 249 F.3d 1010, 1015-16 (D.C. Cir. 2001). In this case, both defendants were convicted of participating in a conspiracy that specifically included concealment as an object of the original unlawful agreement. Indictment ¶ 7. The jury found beyond a reasonable doubt that the defendants conspired not only to commit bribery, but also to defraud the United States by "impairing, impeding, and defeating the lawful functions and duties of the OPM and the FEGLI program." Indictment ¶ 6(a); Verdict Form ¶ 1.A.a [Docket No. 49]. As charged in the indictment, the manner and means by which the defendants attempted to accomplish that object included "providing false statements to federal investigators and the Grand Jury." Indictment ¶ 13.

The present case falls within the exception identified in Grunewald for two reasons: (i) the object of the conspiracy charged here was to impede the function of a governmental agency that exercises continuing regulatory oversight of the program that was defrauded; and (ii) the conspirators attempted to achieve the object of defrauding the agency by forgery, which is a scheme that necessitates continuing deception.

As the Fifth Circuit has noted about the holding in Grunewald, "later cases have recognized that acts of concealment are in furtherance of the conspiracy for limitations purposes where the nature of the conspiracy is such that concealment is part of or in furtherance of the main objectives of the conspiracy." United States v. Mann, 161 F.3d 840, 859 (5th Cir. 1998). The Mann court considered a conspiracy whose nature was similar to that in the present case. The conspiracy charged in Mann included the object to defraud the United States by impeding, impairing, and defeating the lawful function of government agencies -- there, the IRS and the Federal Home Loan Bank Board (the "FHLBB") -- that had continuing regulatory oversight of the fraudulent practice at issue. Id. Under those circumstances, the court recognized that subsequent acts of concealment

6

to defeat that continuing regulatory function were in furtherance of the central object of the

conspiracy, as required under Grunewald.  Id.   As the panel opinion explained:

> The central aim of the conspiracy extended to concealing the fraudulent nature of
> the transaction, in order to evade taxes and maintain control of the institution in the
> face of continual regulatory oversight.  Frustration of investigatory efforts by the
> FHLBB and the IRS in a highly regulated environment was central to the
> conspiracy.

Id.

In the present case, the evidence admitted at trial and recited in the facts section, above,

established that the lawful function of the OPM and the FEGLI program that the defendants

conspired to impair includes the continuing statutory and regulatory duty to determine the correct

legal beneficiary for FEGLI life insurance benefits.  As Mr. Polizzi testified, OFEGLI is required

to seek to recover funds distributed incorrectly.  As he and Mr. LeBron further explained, if the

designation of beneficiary form is determined to be invalid, the legal order of precedence is

triggered.  Indeed, that occurred in this case in March of 2005, when OFEGLI paid an additional

fifty percent of the life insurance benefit to Roy Mayo under the order of precedence.  This fact

demonstrates that OPM and OFEGLI remained engaged in determining who was the correct legal

beneficiary long after the funds were initially distributed to Turner.  Thus, the conspirators' object

of obstructing the continuing regulatory oversight of OPM over the FEGLI program was not

accomplished simply by submitting the forged form, or upon Turner's receipt of the Total Control

Account checkbook from OFEGLI, or upon payment of the bribe money to Andrews, or upon

Turner's disbursement of the funds in that account (although another object of the conspiracy -- to

commit bribery -- may have been accomplished by those occurrences).  Rather, the object to

defraud continued throughout the course of the regulatory inquiry conducted by OPM to determine

who was the proper beneficiary.  That effort remained on-going when Andrews was interviewed in

November 2005.  As explained above, the duties of the OPM-OIG agents included conducting

administrative investigations of OPM programs, in addition to their law enforcement role.

Accordingly, as charged in the Indictment, co-defendant Andrews's attempt to mislead them about

facts relevant to the beneficiary question furthered the object of the conspiracy to impair, impede,

and defeat the lawful function of OPM.[3]

For this reason, Andrews and Turner's conspiracy to defraud a government agency by

forgery is distinguishable from the facts found insufficient in Grunewald.  In Grunewald, the

Supreme Court determined that the goal of that particular conspiracy was to obtain IRS "no

prosecution" decisions.  353 U.S. at 406.  That object was achieved when the IRS issued those

decisions.  Unlike Grunewald, in the present case the conspiracy did not achieve its primary

purpose of defeating the OPM's regulatory function simply by Turner's receipt of life insurance

proceeds.  As explained above, that function included a continuing obligation to determine who

was the correct legal beneficiary.  Andrews's lies to the agents aimed at defeating that function

therefore furthered the central goal of the conspiracy.

In addition, this case is distinct from the allegations found insufficient in Grunewald

because the method employed by Turner and Andrews to achieve their object of defrauding the

OPM necessarily entailed continuing acts of deception.  The conspiracy's object was to defraud

OPM through use of a forgery scheme.  It was central to the success of that conspiracy that OPM

believe it was not a victim of forgery.  A forgery is itself a continuing deception -- the forger's

false representation (that the name signed was in fact signed by the person who is named) is

intended to continue until and unless the recipient determines it to be untrue.  Thus, if OPM were

---

[3] It is true that the acts of concealment also served the additional purpose of shielding the defendants from prosecution.  There is no reason to conclude, however, that the fact that the act of concealment served dual purposes takes the case outside the distinction recognized in Grunewald for acts of deception that further the primary object of the conspiracy.

to send agents to inquire, as it was obligated to do, the success of the forgery would depend upon

misleading them about facts pertinent to that inquiry.

The Supreme Court long ago recognized the continuing nature of conspiracies of the sort

charged here, where the object is not accomplished while the fraud can still be discovered.  In a

post-<u>Grunewald</u> tax evasion conspiracy case, the Court held that filing a false tax return "was but

the first step in the process of evasion.  The concealment of the 'holdout' income must continue if

the evasion is to succeed.  <u>It must continue until action thereon is barred and the evasion</u>

<u>permanently effected.</u>"  <u>United States v. Forman</u>, 361 U.S. 416, 423-24 (1960) (emphasis added).

Therefore, the Court held that the object of the conspiracy to evade taxes was not accomplished

upon the filing of false returns, but continued through numerous false statements made to IRS

agents while they were attempting to investigate the false filings.  <u>Id.</u>[4]  In the same way as the tax

evasion conspiracy in <u>Forman</u>, the forgery conspiracy in the instant case is like kidnapping and

auto theft as described in <u>Grunewald</u>: each conspiracy by its nature may necessitate continuing

acts of concealment for its success.  <u>Grunewald</u>, 353 U.S. at 405.  This is particularly so when the

conspiracy contemplates fraud against an agency with continual regulatory oversight of the

defrauded program.

In sum, as the Indictment charged and the evidence presented at trial bore out, it is entirely

reasonable to conclude that from inception of the forgery scheme each defendant knew that the

success of the conspiracy depended upon lulling OPM into believing it was not a victim of fraud.

If OPM or OFEGLI launched an inquiry or sought to recoup its loss, the conspirators knew they

would need to take steps to mislead OPM about facts tending to reveal the forgery in furtherance

---

[4]  The facts in <u>Foreman</u> involving the subsequent false statements to the IRS agents are related in more detail in the opinion of the court below.  <u>See</u> <u>United States v. Forman</u>, 259 F.2d 128, 133 (9th Cir. 1958).

of the object of their scheme.  As shown at trial, it was part of OPM's lawful function to make

inquiries about a putative beneficiary when questions arose.  That function continued after the

funds were issued to the putative beneficiary.  Accordingly, the conspirators' need to deceive

OPM to fulfill the object of the conspiracy and defeat its lawful function continued as well.[5]

## II.    No Downward Departure for Health Reasons Is Warranted

In his sentencing letter, the defendant requests home detention in lieu of incarceration

based upon Section 5H1.4 of the Guidelines because of his medical ailments.  As the Guidelines

state and the D.C. Circuit has acknowledged, a defendant's physical condition is not ordinarily

relevant in determining whether a sentence should be outside the applicable guideline range.

United States v. Brooke, 308 F. 3d 17, 19 (D.C. Cir. 2002), citing Koon v. United States, 518 U.S.

81, 96 (1996) (holding that a court should depart "only if the factor is present to an exceptional

degree or in some other way makes the case different from the ordinary case where the factor is

present").  Sentencing below the Guidelines range because of a physical condition requires the

defendant to have an extraordinary physical impairment, not that the defendant be merely infirm.

Id. at 21.  An "extraordinary impairment" is one that cannot be adequately cared for by the prison

system.  United States v. Altman, 48 F.3d 96, 104 (2d Cir. 1995).

---

[5]  Although the United States does not dispute the question, the D.C. Circuit has not addressed whether the holding in United States v. Booker, 543 U.S. 220 (2005), may affect the ex post facto consequences of applying a later edition of the Guidelines to prior offense conduct. At least one other Circuit has concluded that the Guidelines, advisory after Booker, have no such force or effect.  See United States v. Demaree, 459 F.3d 791, 792-95 (7th Cir. 2006).  But cf. United States v. Safavian, 461 F. Supp. 2d 76, 81-83 (D.D.C. 2006) (finding that application of the so-called "one book" rule would violate the ex post facto clause after Booker).  The government does not contend that the Seventh Circuit reached the correct conclusion about the force of the Guidelines in Demaree.  Indeed, the government conceded error in that case.  See Demaree, 459 F.2d at 793.  However, we note the case to notify the Court that the law presently appears unsettled on the question.

Courts have denied downward departures for serious and life-threatening diseases, finding

that they were not extraordinary for sentencing purposes.  See United States v. LeBlanc, 24 F.3d

340, 348-49 (1st Cir. 1994) (downward departure not warranted where defendant, who had

suffered two heart attacks, could be  treated with medication);  United States v. Carey, 895 F.2d

318 (7th Cir. 1990) (fact that defendant is afflicted with cancer, without more, is not an

extraordinary physical impairment); United States v. DePew, 751 F. Supp. 1195, 1199 (E.D. Va.

1990) (holding that AIDS, like "cancer or various other terminal or life threatening conditions" is

not an extraordinary physical impairment warranting departure); United States v. Parasconda, 69

Fed. App. 74, 80 (3d. Cir. 2003) (downward departure denied where defendant was on permanent

disability for shoulder, neck and back injuries and suffered post traumatic stress disorder

("PTSD"), hypertension, reflux disease, a bleeding ulcer, persistent generalized anxiety, and

moderate-to-severe depression) (unpublished table decision, attached as Exhibit A); United States

v. Altman, 107 F.3d 4, 1996 WL 739239 at *1-2 (2d Cir. 1996) (downward departure not

warranted where defendant had serious heart problems and degenerative hip disorder, both

requiring surgery) (unpublished table decision, attached as Exhibit B).  Because prisoners with

medical problems are constitutionally entitled to receive medical treatment, the Bureau of Prisons

(the "BOP") has the medical personnel and facilities required to furnish defendants with the care

and treatment they need.  DePew, 751 F. Supp. at 1199, citing Estelle v. Gamble, 429 U.S. 97, 103

(1976) (prisoners constitutionally entitled to appropriate medical care and treatment).

In this case, the defendant argues that his array of medical issues warrants home detention

rather than a period of incarceration.  As the defendant's motion indicates, he suffers from

pulmonary disease, PTSD, arthritis, neuropathy, diabetes, gout, and bowel and bladder problems

that have resulted in hospitalization and renal failure.  The defendant's medical problems, while

unfortunate, do not rise to the level of extraordinary.  They are not conditions for which the BOP is

unable to provide adequate treatment.  As the defendant's motion points out, medical care is

available within the BOP and, if the BOP determines its facilities cannot adequately provide care

for the defendant, he can be transferred to local hospitals while he continues serving his sentence.

At sentencing, the Court can recommend to the BOP that the defendant be placed in a prison that

has substantial medical facilities, and can order the BOP to ensure that the defendant is getting the

care that he needs.

In addition to the fact that the defendant's medical situation does not fall outside the

heartland of medical challenges that inmates often suffer, sentencing him to a term of incarceration

is consistent with the Guidelines and the sentencing factors outlined in 18 U.S.C. § 3553(a).

Specifically, a term of incarceration, rather than home detention, will reflect the seriousness of the

offense, promote respect for the law, and provide a just punishment for the defendant's conduct.  It

will serve the goal of deterrence and afford consistency with the sentence of the defendant's co-

conspirator, Latanya Andrews.

Conclusion

For the reasons recited above,  in fashioning a reasonable sentence for the defendant under

the statutory sentencing factors this Court should consider the 2006 edition of the Guidelines and

decline to depart downward based on the defendant's claimed medical impairment.

13

Dated: July 13, 2007

Respectfully submitted,

William M. Welch, II
Chief


_____/s/_____

Daniel A. Petalas
Ann C. Brickley
Trial Attorneys
Public Integrity Section
Criminal Division
United States Department of Justice
10th Street and Constitution Avenue, NW
Washington, DC 20530
202-514-1412
202-514-3003 (facsimile)
dan.petalas@usdoj.gov
ann.brickley@usdoj.gov

CERTIFICATE OF SERVICE

The undersigned counsel for the government hereby certifies that he caused a true and

correct copy of the foregoing to be served upon the following counsel of record by electronic mail

through the Court's electronic case filing system this 13th day of July, 2007:


Jerry Ray Smith
Counsel for Peter Turner
717 D Street, N.W., Suite 400
Washington, D.C. 20004


                                                    /s/
                                                  Daniel A. Petalas
                                                  Trial Attorney