UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )( | |
| )( | Criminal No. 06-26-01 |
| v.    )( | Judge Kollar-Kotelly |
| )( | Sentencing: July 23, 2007 |
| PETER TURNER    )( | |

**REPLY TO GOVERNMENT'S RESPONSE
TO DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW the defendant, Peter Turner, by and through undersigned counsel, and respectfully replies to the Government's Response to Defendant's Sentencing Memorandum (Response). In support of this reply, Mr. Turner would show:

1.  In Grunewald v. United States, 353 U.S. 391, 394 (1957), the defendants conspired to shield taxpayers from liability for having filed false returns by wrongfully using their influence to obtain "no prosecution" decisions for those taxpayers from the IRS. Additionally, the defendants conspired to engage in subsequent activities to insure that the fraudulent nature of the "no prosecution" decisions would not be discovered. Id. at 395. At trial, the conspiracy was characterized as one whose primary purpose was the fraudulent obtainment of the "no prosecution" decisions. The Supreme Court ruled that, under this characterization, the conspiracy would have ended upon the obtainment of the "no prosecution" rulings and that the subsequent acts done to prevent discovery of the fraudulent nature of the "no prosecution" decisions could not be viewed as being a part of the conspiracy. Id. at 399- 406.

2.  The indictment in Grunewald alleged that the defendants conspired to defraud the United States. In this regards, the situation in Grunewald is the same as the situation presented in the instant case. Additionally, in Grunewald, the indictment further alleged that it was part of the conspiracy for the defendants to engage in activities to

1

conceal their illegal conduct and prevent it from being prosecuted, and it went on to allege with specificity what some of those cover-up activities consisted of.  Id. & fn.3.  In this regards, too, the situation in Grunewald is the same as here.  Lastly, in Grunewald, the government presented evidence at trial to show that the defendants did in fact engage in specific activities to conceal their illegal conduct and prevent it from being prosecuted after they had completed their defrauding the government.  Id. at 395.  Once again, the situation in Grunewald is the same as the situation here.

       3.       In Grunewald, the Supreme Court expressly and unambiguously held that the cover-up activities that the defendants engaged in after they had completed their primary objective of obtaining the "no prosecution" decisions could not be used to extend the life of the conspiracy.  Grunewald, 353 U.S. at 399-406.  Thus, the Court ruled that the statute of limitations for the conspiracy started to run when the defendants had improperly obtained the last "no prosecution" decision—not when the last act of covering up the illegal obtainment of the "no prosecution" decisions occurred.  Id. at 406.  The Court indicated that, to determine when a conspiracy ends, a reviewing court must consider the "main objective" of the conspiracy.  Moreover, the Court stated that "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives, and acts of concealment done after these central objectives have been obtained, for the purpose of only covering up after the crime."  Id.  The Court stated that to allow acts of concealment done after the completion of the main objective to extend the life of the conspiracy would mean that a conspiracy could be indefinitely lengthened just because the conspirators are able to keep its existence a secret.  The Court stated that this cannot be allowed because it would result in an impermissible broadening of "the already pervasive and wide-sweeping nets of conspiracy prosecutions."  Id.  404-05.

4. In the instant case, the defendants were charged with conspiring to fraudulently obtain monies from Ms. Mayo's life insurance policy. It is also claimed that, after they had fraudulently obtained the monies, they later took steps to conceal their earlier illegal conduct and prevent it from being prosecuted. The main objective of the conspiracy (the fraudulent obtainment of the life insurance monies) was achieved, at the latest, in 2002, which is when Mr. Turner paid codefendant Leonard's spouse $1,000.00 after having received the payout from Ms. Mayo's life insurance policy. Accordingly, the conspiracy ended no later than then, and under Grunewald, the subsequent cover-up activities that the defendants allegedly engaged in cannot be viewed as being a part of the conspiracy.

5. Notwithstanding Grunewald, the government claims that the conspiracy here lasted until 2005 because that is when Ms. Andrews made the false and misleading statements to the OPM agents who were investigating the earlier misappropriation of Ms. Mayo's death benefits. Response at 8. This is of course significant because, prior to 2004, the Sentencing Guidelines set the base offense level for the conduct that Mr. Turner was convicted of at 10. Starting with the 2004 manual, the Sentencing Guidelines now set that base offense level at 14.

6. The government asserts that Ms. Andrews' false and misleading statements to the OPM agents in 2005 should be considered a part of the conspiracy because, when she made the statements, she was not simply covering up the earlier achieved misappropriation of Ms. Mayo's life insurance benefits. Rather, she was acting in direct furtherance of the as of yet unachieved main objective of the conspiracy. This is because—according to the government—the "primary purpose" of the conspiracy was not the misappropriating of monies from Ms. Mayo's life insurance policy. Instead, the

primary purpose of the conspiracy was "defeating the OPM's regulatory function." Response at 8.

7. The government's characterization of the conspiracy here is, upon scrutiny, somewhat nonsensical. The government is saying that the grand jury here believed that, when the conspiracy was first formed, the primary goal of the conspirators was not to fraudulently obtain monies from Ms. Mayo's life insurance policy but rather to defeat OPM's investigation into that misappropriation—as if the conspirators only set out to misappropriate Ms. Mayo's benefits because doing so was part of a larger desire to impede the functioning of the OPM. However, it cannot seriously be claimed that, in trying to defeat the regulatory function of the OPM, the conspirators were doing anything other than attempting to conceal and avoid prosecution for having misappropriated Ms. Mayo's benefits. It must therefore be acknowledged that the main objective of the conspiracy was the misappropriation of those benefits—not the defeating of the OPM's regulatory function. It would be somewhat absurd for the grand jury to have charged otherwise, and in fact any fair reading of the indictment shows that they did not charge otherwise. Accordingly, the conspiracy here must be viewed as having ended when the conduct related to the misappropriating of the benefits was complete—that is, in 2002 at the latest.

8. In support of it position that Ms. Andrews' false and misleading statements to the OPM agents were actually made in direct furtherance of the main objective of the conspiracy (as opposed to being made to simply cover-up the already attained achievement of the main objective), the government cites to United States v. Mann, 161 F.3d 840 (5th Cir. 1998), Response ay 6-7, and United States v. Forman, 361

U.S. 416 (1960), id. at 9. The government's belief that these cases support its position, however, is based on a superficial and incorrect reading of the cases.

9. In Mann, the defendants, who were involved in banking, were charged with conspiring to misappropriate banking monies and with conspiring to defeat the governmental functions of the regulatory agencies that oversaw the fraudulent transactions in question. Mann, 161 F.3d at 846-48. Noting that the defendants were operating in a "highly regulated environment" and were charged with conspiring to make fraudulent transactions "in the face of continual regulatory oversight," the court ruled that the "central aim of the conspiracy extended to concealing the fraudulent nature of the transaction[s]." Id. at 859. In reaching this conclusion, the Court reasoned that "acts of concealment are 'part of the central conspiracy itself' where 'the purpose of the main conspiracy… by its very nature, called for concealment." Id. (quoting United States v. Diez, 515 F.2d 892, 897-98 (5th Cir. 1975).

10. Despite the government's claim to the contrary, the instant case is not at all like Mann. Here, the main purpose of the conspiracy (the fraudulent obtainment of Ms. Mayo's life insurance benefits) did not by its very nature call for subsequent concealment. OPM's involvement in the matter was not a foregone conclusion at the time that the conspiracy was hatched. Indeed, the alleged acts of concealment here only became necessary once the OPM started investigating the earlier fraud. The fraud at issue here did not occur in a highly regulated environment, and the OPM was not providing continuing regulatory oversight, such that it can be said that any plan to obtain the life insurance benefits must have necessarily included at its inception a plan to defeat OPM's investigation. Unlike the regulatory agencies in Mann, the OPM here was not actively scrutinizing the defendants' conduct before, during, and after they engaged in the

5

fraudulent transactions at issue.  Here, the fraud occurred, and then some time later, the OPM came to suspect the fraud and started investigating it.  Thus, it cannot be claimed, as it was in Mann, that the conspiracy when formed must have necessarily included a plan to defeat regulatory oversight.

   11. The other case the government relies on is Forman, 361 U.S. 416.  In Forman, the defendant was charged with conspiring to evade taxes by concealing income.  The indictment alleged that, from 1942-1945, the defendant participated in the submission of income tax returns that under reported income, and the indictment further alleged that, up until 1953, he took further steps to conceal the existence of the unreported income related to those tax returns.  Id. at 423.  On appeal, the defendant argued that the conspiracy was "consummated" when the last false income tax was filed in 1945 and that the subsequent steps that were taken to conceal the income related to the tax returns could not be used to prolong the life of the conspiracy past 1945.  The Supreme Court rejected the defendant's characterization of the conspiracy, stating that the principal object of the conspiracy was not the filing of false tax returns but rather the evasion of income taxes.  The filing of the tax returns was but "the first step in the process of evasion."  Id. at 423-24.  Accordingly, the Court viewed the subsequent acts of income concealment as being a fundamental part of the conspiracy, keeping it alive until 1953.  Id. at 424.

   12. Notwithstanding the government's claim to the contrary, the instant case is not at all like Forman.  Here, the conspiracy cannot credibly be characterized in a way that is comparable to Supreme Court's view of the conspiracy in Forman.  It cannot be seriously contended that the fraudulent obtainment of the life insurance monies here was but a first step in a larger plan to defeat the OPM's regulatory function.  While the

defendant in Forman obviously set out to first and foremost conceal income, the defendants here did not set out to first and foremost defeat OPM's regulatory function. If anything, they only sought to conceal their activities from OPM after it had become clear that OPM was investigating the earlier misappropriation of monies. Accordingly, the acts of concealment that occurred here can only be characterized as attempts to cover up a conspiracy that had already achieved its purpose, and they therefore cannot, under Grunewald, be used to prolong the life of that conspiracy.[1]

13.   Mr. Turner's co-defendant, Ms. Andrews, has raised on appeal the very argument regarding the duration of the conspiracy that Mr. Turner is making in this reply and in his Memorandum in Aid of Sentencing that he filed earlier. It is undersigned counsel's understanding that, because of this argument, the United States Court of Appeals for the District of Columbia Circuit has ordered that Ms. Andrews be released pending appeal. Of course, in order to release someone pending appeal, a circuit court must find, among other things, that the argument the person is raising on appeal is "likely" to result in a successful outcome. See 18 U.S.C., Section 3143(b)(2)(B).

14.   In its Response, the government states that Mr. Turner's medical condition is not serious enough for the Court to depart downwardly and sentence him to home

---

[1] At this point, it should be noted that in Grunewald, the Supreme Court indicated that there was an alternate view of the conspiracy at issue there in which the acts of concealment could have been done in furtherance of the main objective of the conspiracy. The Court stated that the conspiracy could have been characterized not as one whose primary purpose was the fraudulent obtainment of "no prosecution" decisions but as one whose primary purpose was simply tax evasion. Under this characterization, the acts of concealment that came after the "no prosecution" decisions were obtained could still be viewed as occurring within the life of the conspiracy because the purpose of the conspiracy was not to obtain "no prosecution" decisions but rather to evade taxes—a goal that had not yet been achieved at the time that the acts of concealment were engaged in. Under this alternate characterization of the conspiracy, the acts of concealment would be on par with the obtainment of the "no prosecution" decisions, as both were done in furtherance of the one overall plan to evade taxes. Grunewald, 353 U.S. at 406-11. Of course, in the instant matter, an alternate view of the conspiracy that includes the acts of concealment that occurred after the fraudulent obtainment of the Ms. Mayo's life insurance benefits cannot credibly be put forward. As already stated, it cannot really be said that, when the conspiracy was formed, the conspirators had as their primary goal the defeating of OPM's regulatory function over and above the fraudulent obtainment of Ms. Mayo's life insurance benefits.

detention instead of incarceration. Response at 10-12. In support of this position, the government cites to a five cases (two of them unpublished) where the defendant's medical condition was not deemed sufficiently severe to warrant a downward departure for medical reasons. Response at 11. A simple review of those cases, however, will show that none of the defendants at issue had nearly as many serious medical problems as Mr. Turner does. Moreover, in none of those cases was the defendant's medical condition actively deteriorating and in the process of being re-evaluated by doctors like Mr. Turner's is. Additionally, in none of those cases was the defendant's daily functioning anywhere near as poor as Mr. Turner's daily functioning is.[2] As documented by filings attached to Mr. Turner's earlier Memorandum in Aid of Sentencing, Mr. Turner is incontinent of bowel and bladder, has difficulty dressing and feeding himself, is largely unable to walk, and cannot breathe at night without being attached to an oxygen pump.

15.    In <u>United States v. Greenwood</u>, 928 F.2d 645 (4th Cir. 1991), the court held that a downward departure to probation was warranted because the defendant had had both legs amputated below the knee (due to action in Korea) and was getting treatment at a Veterans Administration hospital that would be jeopardized if he was incarcerated. It is submitted that the defendant in <u>Greenwood</u> was probably not as severely incapacitated as Mr. Turner is. Moreover, there is no evidence that the defendant had any life-threatening conditions or even any other serious medical conditions apart from being a double amputee. Accordingly, it appears that Mr. Turner is actually worse off than the defendant in <u>Greenwood</u>. It should also be pointed out that

---

[2] It should also be pointed out that, in one of the government's cases (<u>United States v. DePew</u>, 751 F.Supp. 1195 (E.D. Va. 1990)), the defendant had been convicted of offenses related to the sexual torture and murder of juveniles and was claiming a downward departure on the sole ground that he had AIDS.

8

Mr. Turner, like the defendant in <u>Greenwood</u>, is currently receiving ongoing medical treatment that would be jeopardized if he were incarcerated.

16.     In <u>United States v. Baron</u>, 914 F.Supp 660 (D. Mass. 1995), the defendant, like Mr. Turner, was elderly, had a cardiac condition, and was suspected of having prostrate cancer.  Also like Mr. Turner, the defendant's condition was unstable and vulnerable to rapid deterioration.  While the defendant had had his pituitary gland removed (a condition that Mr. Turner does not share), he did not—apart from the heart condition and possible prostrate cancer—have any of the other serious medical problems that Mr. Turner has.  In <u>Baron</u>, because of the defendant's medical problems, the court ruled that a downward departure to home detention was warranted.  The court further noted that to incarcerate the defendant would mean uprooting him from the medical care that he was actively receiving from "physicians who are intimately familiar with his situation." <u>Id.</u> at 664.  Mr. Turner's situation is not far off from the defendant's situation in <u>Baron</u>.  Indeed, if anything, Mr. Turner's case presents a more compelling case for home detention.  It should also be noted that the court in <u>Baron</u> brought to attention the fact that studies show that incarceration of the elderly and infirm costs "up to three times more than imprisoning younger offenders." <u>Baron</u>, 914 F.Supp. at 664.

17.     In <u>Baron</u>, the court pointed out that prior cases have indicated that, in deciding if home detention in lieu of incarceration is warranted, courts are "obliged to consider" if the defendant has "serious and imminent medical threats… which would be made worse by incarceration." <u>Baron</u>, 914 F.Supp. at 662-63 (citing <u>Greenwood</u>, 928 F.2d 645; <u>United States v. Ghanman</u>, 899 F.2d 327 (4th Cir. 1990); <u>United States v. Carey</u>, 895 F.2d 318 (7th Cir. 1990); <u>United States v. DeCologero</u>, 821 F.2d 39 (1st Cir.

9

1987); DePew, 751 F.Supp 1195)). Consideration of the factors articulated in <u>Baron</u> militates in favor of ordering home detention for Mr. Turner.

18. Under U.S.S.G., Section 5H1.1, "[a]ge may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration." It is submitted that Mr. Turner's age and severely infirmed condition qualifies him to receive a downward departure to home detention under U.S.S.G., Section 5H1.1. Moreover, it bears emphasizing that, if Mr. Turner were incarcerated, the Bureau of Prisons (BOP) would end up having to pay for the extensive amount of medical treatment that he is currently receiving on his own.

19. Under U.S.S.G., Section 5H1.4, "an extraordinary physical impairment may be reason to impose a sentence below the applicable guideline range." Section 5H1.4 goes on to indicate that, "in the case of a seriously infirm defendant," ordering home detention in lieu of incarceration is proper where it is "as efficient as, and less costly than, imprisonment." Mr. Turner has numerous very serious conditions that are unstable and currently deteriorating. In addition to being seriously ill, he is incontinent of bowel and bladder, has difficulty feeding and dressing himself, is largely unable to walk, and cannot breathe at night without being attached to an oxygen pump. Given the medical costs that the BOP would have to bear should Mr. Turner be incarcerated, it is submitted that a fair evaluation of his condition shows that he is qualified for a downward departure to home detention under U.S.S.G., Section 5H1.4 as well.

WHEREFORE, the defendant, Peter Turner, respectfully replies to the Government's Response to the Defendant's Sentencing Memorandum.

        Respectfully submitted,


        _____/s/_____
        Jerry Ray Smith
        Counsel for Peter Turner
        717 D Street, N.W.
        Suite 400
        Washington, D.C. 20004
        Phone: (202) 347-6101