IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           Docket No. 06-026

                                    Washington, D.C.
        vs.                         September 7, 2007
                                    11:00 a.m.
PETER R. TURNER,

        Defendant.
_____

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      Daniel Petalas, Esquire
                         US Department of Justice
                         Criminal Division, Public
                         Integrity Section
                         10th St. & Constitution Ave. NW
                         Washington, DC  20530
                         (202) 514-1412

For the Defendant:       Jerry Ray Smith, Esquire
                         717 D Street, NW
                         Suite 400
                         Washington, DC  20004-2812
                         (202) 347-6101

Court Reporter:          Lisa M. Hand, RPR
                         Official Court Reporter
                         U.S. Courthouse - Room 6505
                         333 Constitution Avenue, N.W.
                         Washington, D.C.  20001
                         (202) 354-3269

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                    P R O C E E D I N G S
 2         THE COURT:  Good morning.
 3         COURTROOM DEPUTY:  Criminal case 06-026-01, the
 4   United States of America versus Peter R. Turner, Dan Petalas
 5   for the Government, Jerry Smith for the Defendant, Defendant
 6   is present in the courtroom.
 7         THE COURT:  All right.  We had continued this from
 8   July 23rd in order to allow Mr. Turner to have some additional
 9   appointments, and we're now going to be -- I did receive a
10   report from defense counsel, which was filed the 31st, which
11   was the second update on Defendant's medical situation, which
12   indicates what additional appointments there might be as well
13   as the latest information that we have on him, so I have that
14   information.
15         MR. SMITH:  Your Honor, I've been trying very hard
16   myself to get an understanding of Mr. Turner's medical
17   situation.  They are in the process of re-evaluating him at
18   this point.  The three things that are the most troublesome
19   about his condition are his kidney disease when it's coupled
20   with his diabetes and also his congestive heart failure.  The
21   kidney disease, he's seeing a specialist, Bruce Kimmel, who I
22   speak of in my second update.
23         And as I talk in that update, one of the problems
24   with kidney disease evidently with people who suffer from
25   diabetes is the rapid onset of acute renal failure, it's much
```

1   home.  However, with restitution obligations, he has no
2   financial ability to pay a fine.
3           In terms of substance abuse, in the 1980s he used
4   marijuana and experimented with powder cocaine, there's no
5   recent use, and I would waive any requirement that he be
6   tested for substance abuse.  In terms of mental health, he has
7   been diagnosed as post-traumatic -- PTSD, and he's had
8   treatment and hospitalization for post-traumatic stress
9   disorder.  He has had treatment and hospitalization at VA
10  facilities over the years relating to this, and it is related
11  to his service in Vietnam.
12          In terms of health, I will indicate that he
13  certainly has several numerous chronic conditions.  He visits
14  medical providers almost on a daily basis, he is on 38
15  medication.  I'll get to his health in a few moments.  On a
16  personal level, he is born of an intact union.  His mother
17  died in 1968, his father is deceased since from about the
18  mid-1980s, he has two siblings.  His first marriage ended in
19  divorce.  He's presently married and was involved in a ten
20  year relationship.  I believe he has five children, I'm not
21  sure -- it doesn't appear he's close to his children.  I know
22  there was one child that had not been heard of since Hurricane
23  Katrina, I don't know whether that's changed or not.
24          MR. SMITH:  That child apparently is deceased, Your
25  Honor.

1           THE COURT: I'm sorry to hear that. In terms of
2  the offense conduct, the Defendant was a volunteer driver for
3  the VA Medical Center -- I'm going to do this in summary form
4  based on the trial. He was friendly with co-worker, Ms.
5  Andrews, who worked at payroll at the VA. Mr. Turner had a
6  romantic relationship with Vester Mayo, who was a nurse at the
7  VA Hospital. Ms. Mayo on December 8th of 2000 suffered a
8  stroke, was hospitalized, and went into a coma, and ultimately
9  died in December of 2000.
10          The Defendant orchestrated a scheme to benefit from
11 fraudulent Designation of Beneficiary form in order to collect
12 50 percent of the policy or $20,500. The form had a forged
13 signature purporting to be Vester Mayo. A friend of the
14 Defendant, Leonard, signed as a witness to Miss Mayo's forged
15 signature. The human resources specialist, James LeBron's,
16 signature was also forged on the form. Obviously, he --
17 Leonard, could not witness Miss Mayo's signing it since Miss
18 Mayo's signature was a forgery. Co-Defendant Ms. Andrews had
19 access to the personnel files and caused -- I think it's what
20 the jury found, this fraudulent Designation of Beneficiary
21 form to be placed in Miss Mayo's personnel file. She received
22 a $1,000 check as the first check used once Mr. Turner
23 received the 20,500.
24          There was testimony he was having forged Ms. Mayo's
25 signature to have money taken out of Mayo's bank account.

1  Also, Mr. Turner also tried to influence, unsuccessfully,
2  Mr. LeBron and the investigation. I will just simply say that
3  without this forged document the benefits would have gone to
4  Miss Mayo's parents initially receiving 50 percent of it. The
5  Government ultimately has paid it out twice. And, frankly, it
6  doesn't look to me, based on Mr. Turner's condition, that
7  they're likely to collect anything, so, they're out the money.
8        I would say in terms of the departure, and I'll go
9  through this at this point. In terms of age, 5H1.1, Mr. Smith
10 you indicated he is 60 years old going on 90, taking it
11 separately, I would not exercise my discretion departing on
12 those grounds. Looking at it in the context of 5H1.4, which
13 is the health, it needs to be an extraordinary physical
14 impairment, which may be a reason to depart downward,
15 exceptional circumstances are required. There are -- the
16 Court looked at some D.C. Circuit cases, U.S. v. Brooke,
17 B-R-O-O-K-E. U.S. v. Adonis. U.S. v. Dyce, D-Y-C-E. And
18 U.S. v. Mason, all of which I believe were cited in the papers
19 in one form or another.
20       Mr. Turner certainly has chronic medical problems.
21 They appear, however, still to be under control for medication
22 and other means. Although he's had some additional testing, I
23 did not see any particularly new diagnoses, they're still
24 evaluating and testing him, he is on 38 medications, which is
25 certainly substantial. He's got congestive heart failure,

1  he's on medication for that.  He's had some control problems
2  with his bodily function.  He has severe neuropathy in his
3  legs which makes it difficult to walk.  He uses inhalers for
4  his asthma.  He uses oxygen for sleep apnea.  He has gout and
5  degenerative joint diseases, and he's on medication for that.
6  He's on medication for diabetes and hypertension.  And the
7  doctors' opinion, in looking at it, even with the additional
8  one, that these are serious, severely limiting and permanent,
9  and I would just simply say, they appear to be more in the
10 context of chronic, they'll be permanent, it would appear.
11 He's going to need to be controlled through medication and
12 other means, which seems to be happening.  There are occasions
13 when things flare up, but it doesn't seem to be a consistent
14 basis where that occurs.
15            I did -- it's not a requirement, certainly, in
16 terms of the cases that I could see here, in order to form my
17 decision, I did have probation check with the Special
18 Assistant to the Assistant Director of the Bureau of Prisons
19 Health Services Division in terms of looking at in-patient
20 chronic care beds that would be available, the kinds of
21 treatment that would be available.  There are federal medical
22 centers that go up to care level three, and there are medical
23 centers for federal prisons that go up to care level four.
24 Obviously, they would need to take a look at Mr. Turner and
25 come to their own conclusions about which is the appropriate

1  level. But we did not get any feedback that seemed to
2  indicate that they thought they were not able to actually
3  treat him.
4         I think under the circumstances, taking it all into
5  account, that the Court -- and one of the things in terms of
6  looking at it as exception, I have to say that I have had
7  other cases which have had chronic, frankly, problems very
8  similar to this. People in wheelchairs with additional things
9  that happen in the Bureau of Prisons. I'm going to find it's
10 a discretionary issue on the part of the Court, and the Court
11 in exercising my discretion, I'm not going to grant the
12 departure. I will allow Mr. Turner to self-surrender, and I
13 would indicate that he would not -- that the earliest he
14 should be asked to appear would be after October 14th so he
15 can get some of those additional tests done.
16        In terms of the sentence itself, I'm not going to
17 depart. I would say that Mr. Turner throughout this has
18 shown no remorse, no acceptance of responsibility. He
19 obviously went forward to trial, and he's entitled to do that,
20 to put the Government to test their evidence against him, and
21 I certainly would not hold that against him, but I must say
22 that there doesn't seem to be any remorse, any indication of
23 any acceptance of responsibility for the difficulties that he
24 has put the Mayo family in, or frankly, the Government. The
25 amount of time and energy that was spent to investigate this,